USCA1 Opinion

 

 November 25, 1994 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT _________________________ No. 93-2373 PAUL S. DOPP, Plaintiff, Appellant, v. JAY PRITZKER, Defendant, Appellee. _________________________ Nos. 94-1130 94-1131 PAUL S. DOPP, Plaintiff, Appellee, v. JAY PRITZKER, Defendant, Appellant. _________________________ ERRATA SHEET ERRATA SHEET The opinion of the court issued on October 28, 1994, is corrected as follows: 1. On page 25, line 13 delete signal for footnote 12, and add the following at the end of the sentence (after "$600,000."): Under the SSA, Pritzker could have exercised the buy-out option as late as 10 years after the formation of the contract (withholding any payment until then). There is evidence in the record, through an expert witness presented by Pritzker, that the prospect of so long a delay would justify a somewhat lower figure, reflective of a time-related discount. The expert testified that this reduction to present value could have brought the present value of the redemption price as of December 3, 1984, as low as $114,638. 2. Delete footnote 12 in its entirety and renumber all subsequent footnotes accordingly. 3. On page 26, line 3 change "the . . . price" to "$114,638." 4. On page 26, line 4, page 27, line 10, page 29, line 7, and page 29, line 12 change "$13,686,600" to "$14,171,962." 5. On page 29, line 10 change "$3,313,400" to "$2,828,038." UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT _________________________ No. 93-2373 PAUL S. DOPP, Plaintiff, Appellant, v. JAY PRITZKER, Defendant, Appellee. _________________________ Nos. 94-1130 94-1131 PAUL S. DOPP, Plaintiff, Appellee, v. JAY PRITZKER, Defendant, Appellant. _________________________ APPEALS FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO [Hon. Jaime Pieras, Jr., U.S. District Judge] ___________________ _________________________ Before Selya and Cyr, Circuit Judges, ______________ and Zobel,* District Judge. ______________ _________________________ Ruben T. Nigaglioni, with whom Diana Mendez-Ondina and _____________________ ____________________ Ledesma, Palcu & Miranda were on brief, for plaintiff. ________________________ Gael Mahony, with whom Frances S. Cohen, David A. Hoffman, ___________ ________________ _________________ Joshua M. Davis, Hill & Barlow, Salvador Antonetti-Zequeira, ________________ _______________ ____________________________ Ricardo Ortiz-Colon, and Fiddler, Gonzalez & Rodriguez were on ___________________ ______________________________ brief, for defendant. _________________________ October 28, 1994 _________________________ _______________ *Of the District of Massachusetts, sitting by designation. SELYA, Circuit Judge. In these appeals, we revisit the SELYA, Circuit Judge. _____________ remedial phase of a protracted dispute in which the main protagonists are a pair of erstwhile partners, Paul S. Dopp and Jay A. Pritzker. The litigation stems from an oral contract between the two men concerning the purchase of the Dorado Beach Hotel Corporation (DBHC), a company that controlled a complex of hotels and golf courses situated on 1,000 beachfront acres along the north shore of Puerto Rico. In an earlier opinion we upheld a jury verdict finding Pritzker liable to Dopp, but vacated both the jury's damage award and the trial court's rulings in connection with equitable relief. See Dopp v. HTP Corp., 947 F.2d 506 (1st Cir. 1991) ___ ____ __________ (Dopp II). On remand, the district court held a second trial to _______ determine Dopp's entitlement to various forms of relief. After a jury returned a series of special findings, see Fed. R. Civ. P. ___ 49(a), the district court entered a revised judgment. Both sides now appeal.1 Their appeals require that we examine: (1) whether the district court lawfully denied Dopp resolution (a form of rescission) as a remedy for contractual breach; (2) whether the jury's assessment of full damages, $17,000,000, was either excessive, as Pritzker claims, or too  ____________________ 1The three appeals with which we are concerned today were consolidated for oral argument with three other appeals arising out of the same case. Since the latter appeals (Nos. 93-2374, 94-1128, and 94-1129, respectively) involve segregable issues they focus on a series of financing agreements entered into between Dopp and three financiers, Robert Yari, Lincoln Realty, Inc., and Baird Patrick & Co., for the apparent purpose of funding Dopp's litigatory efforts we will address them in a separate and subsequent opinion. 4 niggardly, as Dopp asserts; and (3) whether the district court appropriately awarded Dopp attorneys' fees and prejudgment interest, based on its determination that Pritzker displayed obstinacy in conducting the litigation. After a careful examination of the record and the applicable law, we affirm in part, reverse in part, and remand. I. BACKGROUND I. BACKGROUND We divide this segment of our opinion into two subparts, treating the facts and the travel of the case separately. In doing so, we write somewhat sparingly because the background of the litigation is already well-documented. See, ___ e.g., id. at 508-09; Dopp v. HTP Corp., 831 F. Supp. 939, 941-42 ____ ___ ____ _________ (D.P.R. 1993) (Dopp III); Dopp v. HTP Corp., 755 F. Supp. 491, ________ ____ _________ 492-94 (D.P.R. 1991) (Dopp I). ______ A. The Facts. A. The Facts. _________ In May of 1984, Dopp wangled an option to acquire DBHC for the approximate price of $40,500,000. He secured the option with a $2,000,000 letter of credit supplied with the assistance of Island Resorts, S.A. (IRSA), a Panamanian corporation. The option agreement specified that the underlying purchase-and-sale transaction would be consummated no later than December 3, 1984. Though playing for high stakes, Dopp had relatively few chips of his own. Thus, he immediately set out in search of financial backing. He encountered heavy seas. With time running out, Dopp turned to Pritzker. The parties reached an oral agreement on November 30, 1984. Under its terms, Pritzker agreed 5 to provide the funds needed to seal the purchase and reimburse Dopp's and IRSA's costs. In exchange, Dopp agreed that Pritzker would receive an 80% equity interest in a holding company that would be formed to acquire DBHC's stock, and, as a sweetener, that a Pritzker affiliate would be given a long-term contract to manage the hotels coincident with the closing. The parties formed HTP Corporation (HTP) to serve as the holding company. Dopp controlled 20% of HTP's stock in the first instance, but ceded some shares to IRSA in accordance with a prior arrangement. In the end, Dopp retained a 12% interest in HTP. Meanwhile, Pritzker, through a nominee, held an 80% interest.2 On December 3, 1984, Pritzker presented two documents to Dopp that supposedly embodied their oral agreement. Pritzker injected into one of these documents the stock subscription agreement (SSA) a clause granting the majority shareholder (Pritzker) an option to retire the stock held by the two minority shareholders (Dopp and IRSA) for $50,000 per share, or $1,000,000 in the aggregate, at any time within 10 years. With the purchase option due to expire, the move put Dopp at a huge disadvantage. He signed the documents. After HTP obtained a one-day extension from the seller, it closed the underlying transaction on December 4, 1984. HTP bought DBHC's stock for $36,846,000, net of adjustments; the  ____________________ 2For ease in reference, we ignore the nominee, a shell corporation, and treat Pritzker as if he, himself, were the majority shareholder. 6 seller canceled the letter of credit; Pritzker reimbursed Dopp and IRSA for expenses advanced ($710,000); and Dopp received a prearranged $200,000 "consulting fee." B. The Litigation. B. The Litigation. ______________ In mid-1988, Dopp initiated a diversity suit in the United States District Court for the District of Puerto Rico, naming Pritzker, HTP, and several others as defendants. He alleged, inter alia, that the buy-out option in the SSA _____ ____ contravened the oral contract, and that his consent to the SSA had been unfairly procured. After a 10-day trial, a jury found in Dopp's favor, determining that the parties had formed an oral contract on November 30, 1984, and that, thereafter, Pritzker had employed deceit and duress to pressure Dopp into signing the SSA, thereby violating the oral contract. Based on these determinations, the jury awarded Dopp $2,000,000 in damages. Thereafter, the district court, acting in response to Dopp's motion under Fed. R. Civ. P. 59(e), declared the SSA null and void in respect to Dopp's shares in HTP, but declined to order resolution of the oral contract.3 The first trial produced no fewer than ten appeals. After considering them, we upheld the liability determination but vacated both the damage award and the district court's remedial rulings, see Dopp II, 947 F.2d at 520. We then remanded for ___ _______  ____________________ 3Resolution is a remedy that, under Puerto Rico law, operates in much the same way as rescission. See P.R. Laws Ann. ___ tit. 31, 3052 (1991); see also Dopp II, 947 F.2d at 510-11. We ___ ____ _______ discuss the nature of the remedy at greater length in Part II(A), infra. _____ 7 further relief-related proceedings, indicating that, "assuming a competent evidentiary predicate, the jury may be instructed on, and asked to determine, variously: (1) full damages . . .; (2) the amount of accessory damages, if any, [pursuant to annulment] . . .; and (3) the amount of accessory damages, if any, [pursuant to resolution] . . . ." Id. at 519. We also observed that ___ "annulment and resolution are mutually exclusive remedies," and that "the plaintiff may or may not . . . satisfy the district court that he is entitled to an order for resolution of the Oral Contract." Id. at 520. ___ On March 27, 1993, a second jury rendered a series of special findings. The jury fixed the amount of full damages at $17,000,000, and the amount of damages ancillary to resolution (if resolution were ultimately ordered) at either $19,621,000 or $210,071,000, depending on whether the court might order resolution in natura or in kind. See Dopp III, 831 F. Supp. at __ ______ ___ ________ 942 & n.5. The jury determined that, if Dopp elected annulment, there would be no accessory damages. See id. ___ ___ On September 9, 1993, the district court made certain supplementary rulings. Among other things, the court denied Pritzker's motions for judgment as a matter of law and for a new trial; put a damper on Dopp's quest for resolution; rejected Dopp's motion to alter or amend the judgment; upheld the jury's assessment of full damages; and awarded Dopp prejudgment interest 8 and attorneys' fees.4 See id. at 943-52. These appeals ensued. ___ ___ II. RESOLUTION II. RESOLUTION In our earlier opinion, we determined that up to three main remedies might be available to Dopp, namely, annulment of the SSA, resolution of the oral contract, or full damages. Dopp ____ II, 947 F.2d at 519. We noted that, in the event Dopp achieved __ either annulment or resolution, the jury might also award accessory damages. See id. We defined the third remedy, "full ___ ___ damages," as comprising "the amount of damages which would make Dopp whole in the absence of either annulment or resolution . . . ." Id. Withal, we cautioned that the availability of any given ___ remedy depended upon the existence (or nonexistence) of a "competent evidentiary predicate." Id. ___ At the second trial, Judge Pieras instructed the jurors as to each of these three remedies and commanded them to determine on a contingent basis the amount of money damages, if any, that each anodyne actually would entail. The jurors complied. Following the jury's calculation of potential damages, the judge asked Dopp to elect a remedy. Dopp chose resolution. Much to his dismay, the district court ruled that, given the evidence, resolution was unobtainable. Under protest, Dopp then elected an alternate remedy: full damages. He now beseeches us  ____________________ 4The district court also made a number of rulings in regard to third parties who claimed an interest in the proceeds of the litigation through prior arrangements with Dopp. See Dopp III, ___ ________ 831 F. Supp. at 952-59. We leave these rulings to one side for present purposes, intending, however, to deal with them in due course. See supra note 1. ___ _____ 9 to reverse the district court's denial of resolution. In order to respond to Dopp's importunings, we must determine the nature of resolution under Puerto Rico law, settle upon the proper standard of review, consider whether the court below paid sufficient homage to the lessons of Dopp II, and, ________ finally, evaluate the sturdiness of the district court's ruling. A. Legal Principles. A. Legal Principles. ________________ The remedy of resolution emanates from article 1077 of the Puerto Rico Civil Code, which reads in pertinent part: The right to rescind the obligations is considered as implied in mutual ones, in case one of the obligated persons does not comply with what is incumbent upon him. The person prejudiced may choose between exacting the fulfillment of the obligation or its rescission, with indemnity for damages and payment of interest in either case. He may also demand the rescission, even after having requested its fulfillment, should the latter appear impossible. . . . P.R. Laws Ann. tit. 31, 3052 (1991). It is noteworthy that "[n]ot every breach of a contractual obligation gives rise to a resultory action under article 1077." Dopp II, 947 F.2d at 510-11. To pave the way for _______ the remedy, the unfulfilled obligation must be reciprocal in nature. See id. at 511. Reciprocity inheres when "there are ___ ___ obligations and correlative obligations so interdependent between themselves that one is the consequence of the other, and the performance of said obligation by a contracting party constitutes the motive of the contract for the other party, and vice versa." Ponce v. Vidal, 65 P.R.R. 346, 351 (1945). That is, reciprocity _____ _____ 10 is basically a way of saying that a particular obligation exhibits both mutuality and essentiality what one might term ____ ___ "mutual essentiality." This concept embodies the notion that, in the absence of a particular mutual obligation, the contract would never have come into being, and, thus, should cease to exist. The Supreme Court of Puerto Rico recently fleshed out this idea, observing that not every failure to comply with a mutual obligation will have the effect of terminating the contract. For this to be the case, the unmet obligation must be an essential obligation or fulfillment of the obligation must constitute the motive that induced the other party to enter into the contract. Ramirez v. Club Cala de Palmas, ___ D.P.R. ___, 89 J.T.S. 22 _______ ____________________ (1989) (revised official translation). Put bluntly, "the unfulfilled obligation must be the principal one." Id. ___ The Ramirez court likewise emphasized the overarching _______ concern of article 1077: that contracts, if and when possible, be preserved and ultimately fulfilled. See id. This is the ___ ___ "higher interest" served by a narrow construction of the element of reciprocity. Id. From all that we can discern, then, Article ___ 1077 is a remedy of last resort, reserved for situations in which a party's breach dissipates the very essence of a contract. B. Standard of Review. B. Standard of Review. __________________ We think it follows from this characterization that the applicability of article 1077 in a given case presents a mixed question of law and fact. The Puerto Rico Supreme Court has identified reciprocity as the key principle on which article 1077 11 rests. See Vidal, 65 P.R.R. at 351. And though reciprocity ___ _____ itself is wholly a legal construct, its existence in any particular contractual setting is almost entirely contingent on the determination of a series of essentially factual questions, e.g., the subject matter of the contract, the context in which it ____ arose, the parties' intentions, their course of conduct, and the like. See id. (describing reciprocity as a function of the ___ ___ "character" of a particular obligation). Indeed, to the extent that reciprocity actually resides at the intersection of mutuality and essentiality, its characterization as a mixed question of law and fact becomes virtually unavoidable. Essentiality is closely akin to, if not a species of, materiality, and courts and commentators have long recognized that materiality is primarily a question of fact, the resolution of which is necessarily a function of context and circumstances. See, e.g., Gibson v. City of Cranston, ___ F.3d ___ ____ ______ ________________ ___, ___ (1st Cir. 1994) (No. 94-1375, slip op. at 8-9); see also ___ ____ 3A Arthur L. Corbin, Corbin on Contracts 700, at 309-10 (1960 & ___________________ Supp. 1992) (noting that whether a party's breach "go[es] to the `essence'" of the contract is a function of weighing various factors); 2 E. Allan Farnsworth, Farnsworth on Contracts 8.16, _______________________ at 443 (1990) ("Whether a breach is material is a question of fact."). Putting the issue into this perspective has salient implications for appellate oversight. "The standard of review applicable to mixed questions usually depends upon where they 12 fall along the degree-of-deference continuum: the more fact- dominated the question, the more likely it is that the trier's resolution of it will be accepted unless shown to be clearly erroneous." In re Howard, 996 F.2d 1320, 1328 (1st Cir. 1993); _____________ see also Williams v. Poulos, 11 F.3d 271, 278 (1st Cir. 1993) ___ ____ ________ ______ ("The clearly erroneous standard . . . ordinarily applies when we review a trial court's resolution of mixed questions of law and fact."). Here, the fact-specific nature of the inquiry into resolution demands that we accept the district court's findings unless they are shown to be clearly erroneous.5 In practical terms, this means that the findings will hold sway unless, after reading the whole record and making due allowance for the trier's superior insights into credibility, the reviewing court unhesitatingly concludes that a mistake has been made. See ___  ____________________ 5Referring to the district court's statement that Dopp was "not entitled to resolution as a matter of law," Dopp III, 831 F. ________ Supp. at 959, Dopp suggests that our review should be de novo. __ ____ See, e.g., McCarthy v. Azure, 22 F.3d 351, 354 (1st Cir. 1994) ___ ____ ________ _____ (holding that questions of law engender plenary appellate review). We reject the suggestion. On close perscrutation, it is plain that Judge Pieras reached his conclusion about Dopp's lack of entitlement to resolution as a result of a case-specific, fact-dominated decisional process. See Dopp III, 831 F. Supp. at ___ ________ 946-50. The words contained in a district court's ruling must be "read in context" and judged by their "cumulative import." United States v. Tavano, 12 F.3d 301, 304 (1st Cir. 1993). ______________ ______ Mindful that the law does not require district courts to be letter-perfect in their syntax or choice of phraseology in matters of word usage, we have repeatedly acknowledged that "an appellate court must not hesitate to excuse an awkward locution and give a busy trial judge a bit of breathing room," Lenn v. ____ Portland Sch. Comm., 998 F.2d 1083, 1088 (1st Cir. 1993) (citing ____________________ other cases) we refuse to sacrifice substance on the altar of form. 13 Dedham Water Co. v. Cumberland Farms Dairy, Inc., 972 F.2d 453, ________________ ____________________________ 457 (1st Cir. 1992); Cumpiano v. Banco Santander P.R., 902 F.2d ________ ____________________ 148, 152 (1st Cir. 1990); see also Fed. R. Civ. P. 52(a). In the ___ ____ last analysis, the clear-error rubric betokens a "highly deferential mode[] of review." Howard, 996 F.2d at 1327. ______ Of course, "Rule 52(a) does not inhibit an appellate court's power to correct errors of law, including those that may infect a so-called mixed finding of law and fact, or a finding of fact that is predicated on a misunderstanding of the governing rule of law." Bose Corp. v. Consumers Union of U.S., Inc., 466 __________ _____________________________ U.S. 485, 501 (1984). But, here, although Dopp argues for de __ novo review, he has not shown that any error of law influenced or ____ otherwise tainted the district court's findings of fact. Although he repeatedly describes the court's findings in terms of legal, rather than factual, error, merely calling a dandelion an orchid does not make it suitable for a corsage. As we have remarked before, "[t]he clearly erroneous rule cannot be evaded by the simple expedient of creative relabelling." Reliance Steel ______________ Prods. Co. v. National Fire Ins. Co., 880 F.2d 575, 577 (1st Cir. __________ ______________________ 1989). We have said enough on this score. Since "we will not permit parties to profit by dressing factual disputes in `legal' costumery," id., we think that, with one exception, we must ___ subject the district court's denial of a resultory remedy to clear-error review. Before doing so, however, we visit the exception. 14 C. Law of the Case . . . Not! C. Law of the Case . . . Not! _________________________ Dopp boldly contends that the district court failed to recognize the law of the case. A contention that the law of the case precludes reexamination of an issue raises a pure question of law, and, thus, engenders plenary review. See McCarthy v. ___ ________ Azure, 22 F.3d 351, 354 (1st Cir. 1994); Liberty Mut. Ins. Co. v. _____ _____________________ Commercial Union Ins. Co., 978 F.2d 750, 757 (1st Cir. 1992). _________________________ Dopp's "law of the case" argument prescinds from a wildly optimistic reading of our earlier opinion an opinion that, in Dopp's view, directed the district court to grant him resolution. In support of this claim, Dopp adverts to our general discussion of article 1077, both in terms of its possible (past) role in the first jury's determination of damages, see ___ Dopp II, 947 F.2d at 513-14, and in terms of its possible _______ (future) role in the jury trial to be held following remand, see ___ id. at 510-11, 519. ___ To be charitable, Dopp reads our language through rose- colored glasses, ignoring the forest and focusing self- interestedly on a few isolated trees. In the bargain, he cavalierly wrests phrases from their analytical context, disregarding the wise adage that the words contained in judicial opinions "are to be read in light of the facts of the case under discussion." Armour & Co. v. Wantock, 323 U.S. 126, 132 (1944). ____________ _______ The whole purpose of our original analysis was to ascertain, assuming that Article 1077 might have applied, on what theory the _____________________________________________ judge and jury could have generated the determination of damages. 15 We lamented that the actual basis for the damage award was "completely uncertain," Dopp II, 947 F.2d at 513, and that the _______ record revealed "rampant confusion over what relief was warranted," id. at 516. In short, our earlier opinion shows ___ beyond hope of contradiction that we decided nothing in regard to the ultimate applicability of a resultory remedy. The sockdolager is that Dopp's "law of the case" argument entirely ignores both our prediction that at a second trial Dopp "may or may not . . . satisfy the district court that he is entitled to an order for resolution of the Oral Contract," and our straightforward declaration that we "intimate no view" as to the eventual outcome of this question. Id. at 520. The words ___ could not be plainer or more explicit. Given this express disclaimer, it is fanciful for Dopp to suggest that we bound the lower court to an award of resolution the second time around. D. Analysis. D. Analysis. ________ Having exposed Dopp's threshold contention as baseless, we now confront the critical question: did the district court commit clear error in denying Dopp the remedy of resolution? Based on a painstaking review of an amplitudinous record, we think not. Under the Civil Code, resolution requires more than merely proving the nonfulfillment of some mutual obligation contained in a bilateral contract. Rather, the unfulfilled obligation must be "essential" to the contract, or, phrased another way, the contemplated fulfillment of the obligation must 16 have constituted the contract's raison d'etre. The Ramirez court _____________ _______ put the point succinctly, stating that resolution cannot be grounded in the nonfulfillment of "accessory" or "complementary" obligations obligations that the court described as those which "do not constitute the real consideration for executing a contract and which are incorporated into the same to complete or clarify the contracting parties' stipulations." Ramirez, ___ _______ D.P.R. __, 89 J.T.S. 22 (citing Del Toro v. Blasini, 96 P.R.R. ________ _______ 662 (1968); Velez v. Rios, 76 P.R.R. 806 (1954); Vidal, 65 P.R.R. _____ ____ _____ 346 (1945)). While the breach of such an accessory or complementary obligation "may trigger an action for damages or any other action that the circumstances of each case warrant," such a breach may "never" give rise to a rescissory action. Id. _____ ___ (emphasis in original). This is so, the court said, because "[t]he requirement that the unfulfilled obligation be the principal one serves a higher interest . . . that promotes the fulfillment of contracts, and that prevents that, by a lesser breach of contract, one of the parties may release himself from the obligation, either because he is no longer interested or because the contract does not suit him anymore." Id. (citing 1 ___ Diez Picaso, Fundamentos del Derecho Civil Patrimonial 859 (2d __________________________________________ ed. 1983)). The question of whether Pritzker's provision of an unencumbered, as opposed to encumbered, 12% interest in HTP constituted either an essential obligation of his bargain, or the motive that induced Dopp to enter into the contract, is not 17 necessarily subject to a simple, categorical answer. This very uncertainty is, in itself, a good indicator that the district court's answer, whether affirmative or negative, is not likely to be clearly erroneous. In any event, we discern no clear error here. Judge Pieras, quoting Dopp's own testimony, determined among other things that "[p]roviding Dopp with an unencumbered . . . equity ____________ interest in HTP is not a reciprocal obligation of the Oral Agreement assumed by the defendant. Indeed the plaintiff `fully expected that there would be some reasonable option' and therefore did not rely on the absence of an option clause to enter into the Oral Agreement." Dopp III, 831 F. Supp. at 950 ________ (emphasis in original). We believe that this assessment of Dopp's actual expectation is supportable, and that it alone is sufficient to ground a principled conclusion that the parties regarded the element of non-encumbrance as an incidental, rather than an essential, obligation of their contract. If it is true that Dopp, prior and pursuant to the formation of the oral contract, "fully expected that there would be some reasonable option" as he, himself, testified and yet proceeded to the written contract phase without settling this matter precisely, it seems eminently reasonable for a factfinder to conclude that the element of non-encumbrance could not have been the raison d'etre _____________ of the oral contract. What is more, the plausibility of this conclusion rests not only on Dopp's own words, but also on other witnesses' 18 testimony to the effect that, when ownership is closely held, buy-out options are a regular attribute of intra-corporate arrangements. For our part, we regard this truth to be self- evident; indeed, it is difficult to imagine an 80% shareholder of a close corporation owning extremely valuable assets who would not routinely demand such protection. Pritzker may have been many things, but, as Dopp well knew, he was neither a neophyte nor an altruist. Hence, Dopp could not reasonably have expected that Pritzker would forgo so elementary a precaution and leave the minority stock unfettered. The interest in preservation and ultimate fulfillment of contracts that drives article 1077, see Ramirez, ___ P.R. Dec. ___ _______ __, 89 J.T.S. 22, does not suggest a contrary result. Here, Pritzker's breach did not render the contract inherently infirm. To be sure, the breach harmed Dopp, but his insistent focus upon the harm begs the real question. The critical determinant of the availability of a resultory remedy is neither the fact nor the magnitude of the inflicted injury, but, rather, whether the defaulting party's breach irretrievably undermined the contract. In this instance, the district court thought not; and we can scarcely conclude, based on the evidence presented, that its decision was clearly erroneous. In a last-ditch effort to turn the tide, Dopp insists that the unreasonableness of the particular buy-out clause that Pritzker inserted into the SSA somehow transmogrifies an accessory obligation into an essential obligation. We do not 19 agree. If the obligation to produce an unencumbered 12% ownership interest was not essential before and at the time of the oral contract and, as we have pointed out, there is adequate evidence to support a conclusion to that effect then it does not matter that the obligation took on added importance as time went by and circumstances changed. Dopp's other arguments on this issue do not require comment. For the reasons set forth herein, we uphold the district court's finding that the obligation shirked by Pritzker lacked mutual essentiality. Accordingly, we affirm the denial of resolution. III. FULL DAMAGES III. FULL DAMAGES Because Dopp was not legally entitled to resolution, his contingent election of an alternative remedy full damages is both valid and binding. Withal, both parties question the amount of the damage award. To answer these queries, we must examine whether the district court correctly instructed the jury as to the relevant measure of damages and, if so, whether the jury's resultant rendition of full damages passes muster. A. The Trial Court's Instructions. A. The Trial Court's Instructions. ______________________________ Under Dopp's rather imaginative theory of the case, full damages, properly computed, total $60,581,000. He contends that the verdict on full damages undershot this target because a pinchpenny trial court charged the jury in too restrictive a manner. Branding those instructions as contradictory to the teachings of Dopp II and characterizing them as "poorly thought- _______ 20 out and convoluted," Dopp asks us to set aside the verdict and mandate further proceedings.6 We conclude that the court did not commit reversible error in framing its jury instructions. Our analysis begins, as it must, with the text of the district court's charge. In relevant part, the judge told the jury: First you must render a verdict as to the amount of the full damages to which Dopp is entitled based on Pritzker's breach of the oral contract. . . . Full damages reflect the amount, if any, that is necessary to compensate Dopp in the event that he does not elect to have the Court enter an order of annulment. They reflect the amount necessary to put Dopp in as good a position as he would have been if the oral contract had been fully performed so that his shares were not being encumbered by the SSA's buy-out clause. The amount of full damages are [sic] therefore the difference between the value of what he was promised under November 30, 1984 oral contract and the value of what he actually received from Pritzker under the December 3, 1984 stock subscription agreement. As we read these words, we believe that the court indicated, in essence, that full damages consisted of the monetary cost of encumbrance, that is, the value of what Dopp had a legitimate right to expect (a 12% interest in HTP, not encumbered in any unorthodox way) less the value of what he actually received (a  ____________________ 6Dopp also insists that in addition to taking other corrective action, we should annul the SSA. He is barking up the wrong tree. If Dopp desired annulment, he could have elected that remedy below. See Dopp II, 947 F.2d at 519. He did not do ___ _______ so. See Dopp III, 831 F. Supp. at 942. Absent such an election, ___ ________ Dopp cannot pursue annulment on appeal. Nor is this outcome unconscionable; as a general legal principle, "[p]arties cannot have their cake and eat it, too." United States v. Weston, 960 _____________ ______ F.2d 212, 215 (1st Cir. 1992). 21 12% interest in HTP, subject to a particularly onerous encumbrance), measured at the time of the breach (December 3, 1984). Dopp disagrees. He posits on appeal, as he did below,7 that the true measure of full damages is the value of the purchase agreement plus a disgorgement premium referable to Pritzker's wrongful possession. In support of this theorem, Dopp directs our attention to certain language contained in Dopp II, _______ to article 1255 of the Civil Code, P.R. Laws Ann. tit. 31, 3154 (1991), and to "[a]n intuitive sense that an injustice is inherent in the District's Court's formulation . . . ." Because these exhortations boil down to a claim that the district court misapprehended the substantive law on damages, appellate review is plenary. See Losacco v. F.D. Rich Constr. Co., 992 F.2d 382, ___ _______ _____________________ 384 (1st Cir.), cert. denied, 114 S. Ct. 324 (1993); see also _____ ______ ___ ____ McCarthy, 22 F.3d at 354. ________ Despite the freedom inherent in plenary review and the generosity of our efforts, we are unable to discern a cognizable legal basis on which Dopp's remedial theory might rest. In particular, we find baffling Dopp's invocation of our earlier opinion. Nothing contained therein suggests, by any stretch of the most elastic imagination, that full damages for purposes of this case could constitute anything more than the cost of  ____________________ 7Dopp properly preserved his rights anent the challenged instructions, making a timely objection as required by Fed. R. Civ. P. 51. He also moved to alter or amend the judgment on this ground, in pursuance of Fed. R. Civ. P. 59(e). 22 encumbrance. Indeed, we specifically defined full damages as "the amount of damages which would make Dopp whole in the absence of either annulment or resolution," Dopp II, 947 F.2d at 519, and _______ the district court's formulation fits neatly within this integument. Moreover, it is virtually a hornbook restatement and application of the concept of contractual wholeness. See John D. ___ Calamari & Joseph M. Perillo, The Law of Contracts 14-4, at 591 ____________________ (3d ed. 1987) ("For breach of contract the law of damages seeks to place the aggrieved party in the same economic position he would have had if the contract had been performed."); 3 Farnsworth on Contracts, supra, 12.1, at 147 ("[C]ourts _________________________ _____ encourage promisees to rely on promises . . . [o]rdinarily . . . by protecting the expectation that the injured party had when making the contract by attempting to put the injured party in as good a position as that party would have been in had the contract been performed, that is, had there been no breach."). Nor need we tarry over Dopp's second source of "support" for his theorem. This so-called source article 1255 of the Civil Code is simply not supportive of Dopp's position. As its text makes clear, article 1255 is relevant only "[w]hen the nullity of an obligation has been declared." P.R. Laws Ann. tit. 31, 3514 (1991). That is not the situation here. Dopp's hole card his stated reliance on his "intuitive sense" of "injustice" does not shore up his hand. The plea that it embodies lies beyond the cognizance of this court, which necessarily deals in the concreteness of fact, law, 23 and logic, not the fluidity of pathos and intuition. Absent a demonstration of legal error and Dopp has offered none we must uphold the district court's charge on damages.8 B. The Amount of Damages. B. The Amount of Damages. _____________________ Using the formula given in the trial court's instructions, the jury calculated Dopp's full damages to be $17,000,000. Pritzker, for his part, is satisfied with the court's instructions but not with the amount of damages. He argues that the verdict is not rationally based on the evidence presented and, hence, that the district court erred in refusing to grant his motion for a new trial. In stark contrast, Dopp contends that the amount is far too scant, and that even "[i]f the jury did exactly that which the district court stated it could reasonably do," its verdict should have been in the vicinity of $39,400,000. Dopp's contention appears to be no more than a recasting of his complaints about the charge, see supra Part ___ _____ III(A), and, at this point, the caterwauling may be rejected out of hand. Pritzker's contention, however, raises serious concerns.  ____________________ 8This ruling reflects not only Dopp's inability to discredit the instructions themselves, but also his failure to substantiate his own, alternative theory of damages. At best, it seems that his theory, which proposes that full damages should include at least the value of the purchase agreement (fixed by the jury in its special findings at $40,000,000), might be viable if Dopp proved that he had the capacity to close the deal without Pritzker's assistance. But the record wholly fails to establish that fact. Indeed, Dopp offered no such proof, and all indications are that he lacked the wherewithal to go forward if Pritzker withheld his financial backing. 24 Because jurors exercise great leeway in evaluating claims and assessing damages, appeals based on verdict size are seldom successful. When a disgruntled defendant complains that a jury award is overgenerous, the verdict ordinarily stands "unless it is grossly excessive, inordinate, shocking to the conscience of the court, or so high that it would be a denial of justice to permit it to stand." Segal v. Gilbert Color Sys., Inc., 746 F.2d _____ ________________________ 78, 80-81 (1st Cir. 1984) (citations and internal quotation marks omitted). Even in cases involving purely economic losses (which, by and large, are more easily quantifiable in dollars and cents than, say, damages for emotional distress), appellate review is extremely deferential, evincing a frank recognition that "the jury is free to select the highest figure for which there is adequate evidentiary support." Kolb v. Goldring, Inc., 694 F.2d ____ _______________ 869, 872 (1st Cir. 1982). Consequently, "such a verdict will be reduced or set aside only if it is shown to exceed any rational appraisal or estimate of the damages that could be based upon the evidence before the jury." Segal, 746 F.2d at 81 (citation and _____ internal quotation marks omitted). The rule that emerges is that, within wide limits, an appellate court must accept a jury's seeming extravagance, even if the court, left to its own devices, would have returned a substantially smaller verdict. See Kolb, 694 F.2d at 871. ___ ____ Stated another way, while "the jury may not render a verdict based on speculation or guesswork," Bigelow v. RKO Radio _______ __________ Pictures, Inc., 327 U.S. 251, 264 (1946), a reviewing court will _______________ 25 not tinker with the jury's assessment of money damages as long as it does not fall outside the broad universe of theoretically possible awards that can be said to be supported by the evidence. This deferential standard imposes a correspondingly heavy burden on parties who challenge the amount of damages awarded by allegedly overgenerous juries. And, moreover, the weight of the burden grows heavier when, as now, the trial judge has reviewed the jury's handiwork and has ratified its judgment. See Ruiz v. ___ ____ Gonzalez Caraballo, 929 F.2d 31, 34 (1st Cir. 1991). __________________ In this case, the upper edge of the universe of sustainable awards is defined by the value of the asset owned by Dopp (the option to acquire DBHC) as of December 3, 1984 (the date of Pritzker's breach).9 Based on the highest credible valuations contained in the record, and recognizing the possibility of nonduplicative aggregation, we conclude that the jurors could have found DBHC's properties to be worth as much as $119,055,000 in late 1984. This figure is based upon an appraisal of the hotel empire conducted by the Merrill Lynch Real Estate Advisory & Appraisal Group (Merrill Lynch),10 read in  ____________________ 9On that date, Dopp owned an option to acquire DBHC. In entering the oral contract, however, Dopp in effect agreed to trade that asset for a 20% interest in DBHC's properties (a portion of which he would then cede to IRSA). Thus, DBHC becomes the proper barometer for measuring value. 10While Merrill Lynch issued its appraisal approximately one year after the transaction closed, the district court admitted it into evidence, and we think the jury could reasonably have relied on it. See, e.g., Federal Sav. & Loan Ins. Corp. v. Texas Real ___ ____ _______________________________ ___________ Estate Counselors, Inc., 955 F.2d 261, 268 (5th Cir. 1992) ________________________ (upholding factfinder's reliance on later appraisal despite evidence of changed market conditions). 26 light of testimony by a different expert witness evaluating certain excess land not included in the Merrill Lynch appraisal. According to this evidence, the empire had a value of $110,000,000, and the excess land had a value of $9,055,000. Hence, the jury lawfully could have valued DBHC's properties, as a whole, at $119,055,000. In turn, this value is the value of the asset the purchase option for the acquisition was to be structured in such a way as to cost Dopp nothing (apart from cession of an 80% interest in the acquired properties).11 On this basis, then, a rational jury, apportioning the overall value, could have concluded that Dopp's anticipated 12% interest in HTP was worth $14,286,600 on the date of the breach. Once the jurors determined an asset value, they next would have needed to determine what portion or percentage of that value constituted the cost of encumbrance. Taking the evidence and arguments advanced at trial most favorably to Dopp, we think that the jury lawfully could have determined that the buy-out option eliminated virtually all the value of Dopp's 12% interest in HTP, save only for the meagre price that Pritzker was  ____________________ 11Pritzker argues that the purchase price (roughly $40,500,000) must be deducted from the value of DBHC before the value of Dopp's pro rata interest is assayed because the purchase ___ ____ price constituted an acquisition cost. We can discern no logical basis for such a deduction. The payment represented Pritzker's __________ acquisition cost not Dopp's. Dopp did not contribute to it; instead, he ceded 80% of the equity in the acquiring entity to Pritzker. That was Dopp's "acquisition cost" and it is fully accounted for by limiting his recovery to 12% of DBHC's actual value a value that did not somehow shrink because HTP or Pritzker tendered the purchase price. Put another way, the value of DBHC remained more or less the same regardless of the amount expended for its acquisition. 27 obligated to pay to redeem Dopp's shares. We conclude that this amount should be the face value of the buy-out option: $50,000 per share, or in the case of Dopp's shares, $600,000. Under the SSA, Pritzker could have exercised the buy-out option as late as 10 years after the formation of the contract (withholding any payment until then). There is evidence in the record, through an expert witness presented by Pritzker, that the prospect of so long a delay would justify a somewhat lower figure, reflective of a time-related discount. The expert testified that this reduction to present value could have brought the present value of the redemption price as of December 3, 1984, as low as $114,638. Thus, the jury could have found that, because of the wrongful encumbrance, Dopp lost an asset worth $14,286,600, and, in lieu thereof, was left with an asset worth no more than $114,638. On these assumptions, a verdict for compensatory damages in the amount of $14,171,962 is adequately supported by the evidence. Beyond this amount, the jury's award is problematic. We are unable either to explain the excess or to locate an evidentiary hook on which it might be hung. The court below tried justifying the added damages in the following manner: In calculating the loss suffered by Dopp . . ., the jury need not have limited its consideration to the actual value of Dopp's unencumbered shares in HTP as of the date of the breach of the Oral Contract. The jury was required to determine Dopp's loss as of ____ the date of the breach; however, at that moment Dopp's loss included the likelihood that he would be deprived of any participation in the future profits generated 28 by the properties. The jury could have taken into account that a corporation which owns world-class resort properties could potentially generate considerable profits profits which would be denied to Dopp . . . . Like any investment, Dopp's shares had the potential to make money or to lose money. And they had this potential ad infinitum . . __ _________ . . Dopp III, 831 F. Supp. at 945. In other words, the district ________ court visualized the premium added by the jury as representing compensation for Dopp's share of the venture's profits from the date of the verdict "back to December 3, 1984, the date of the breach." Id. ___ In our view, the district court's reasoning is flawed. While past profit potential may very well have been ascertainable and quantifiable, there is no indication in the record that the jury had before it specific evidence that would have allowed it to engage in this kind of calculation. Thus, the inclusion of a pro rata share of past profits as part of the verdict is ___ ____ forbidden. Although juries generally enjoy broad latitude in determining damages, their authority is not without all limits. In the case of economic damages, in particular, the jury's award must be rooted in an adequate evidentiary predicate. See Segal, ___ _____ 746 F.2d at 81; Kolb, 694 F.2d at 872. Since a thorough ____ canvassing of the trial record fails to unearth any such support, we are constrained to conclude that the jury, in exceeding a $14,171,962 figure, could not have done so on the basis of a wrongful diversion of profits except by an impermissible resort to speculation and surmise. 29 This conclusion is staunchly reinforced by the fact that the judge's charge made no mention of Dopp's putative participation in past profits. To the contrary, the judge cautioned the jurors that even though "[y]ou have listened to considerable evidence . . . which bears on the finances of the Dorado Beach Hotel Corporation during the period following Pritzker's breach of the oral contract on December 3, 1984 . . . [f]or the purposes of assessing Dopp's damages, you must disregard this evidence." It is a bedrock rule that juries must act within the parameters of the court's instructions. See Sparf ___ _____ & Hansen v. United States, 156 U.S. 51, 67 (1895). This rule has ________ _____________ particular pertinence where, as here, the instructions are crisp, clear, and cogent. Thus, the district court's charge totally undermines its later attempt to salvage the verdict.12 Dopp also tries to justify the excess portion of the verdict on other grounds. His most forceful suggestion is that the jury, in determining full damages, appropriately could have considered the value of the management contract for the hotels an asset worth, to Dopp's way of thinking, an additional $35,200,000. He argues that, because Pritzker carved this  ____________________ 12There is perhaps another reason for rejecting the district court's explanation: the necessity to safeguard against the risk of duplicative recovery. After all, the expert valuations of DBHC, such as the Merrill Lynch appraisal, already included _______ ________ future profit projections. While we understand that the projected profits included in those valuations may be qualitatively distinguishable from the venture profits of which the district court wrote, we also appreciate that a jury overwhelmed by datum upon datum of economic estimations could quite easily have conflated the two species of gains. 30 contract out of the deal despite the fact that it was part of DBHC's inherent value, there is "ample evidence" to conclude that "the $17 million jury's valuation of Dopp's full damages is, if anything, too low by any standard." On close inspection, however, Dopp's "ample evidence" proves no sturdier than the proverbial house of cards.13 In our estimation, the management contract is wholly irrelevant to the issue of full damages. As the parties themselves expressly agreed in the oral contract, the management contract was to be awarded to a Pritzker affiliate, not to either Dopp or DBHC. Hence, the management contract bears no relationship whatever to Dopp's damages or to the value of DBHC, regardless of whether it may have constituted, as Dopp now alleges, "a value inherent to [sic] Dopp's purchase-sale contract." We need go no further on the issue of full damages. We hold that the jury's verdict is untenable to the extent that it exceeds $14,171,962. Accordingly, we have no principled alternative but to direct the district court to order a conditional new trial for the sole purpose of redetermining full damages, the condition being that if Dopp agrees to remit $3,313,400 from the award, or, put another way, if he agrees to accept a reduction of the "full damages" award to $14,171,962,  ____________________ 13Dopp also attempts to justify the jury verdict based on "expectations of profit sharing and capital appreciation [that] were destroyed by Pritzker's imposition of the buy-out clause." This argument parallels the district court's rationale, and founders for the reasons previously discussed. 31 then the verdict, as reduced, may stand. Should Dopp fail to consent to such a remittitur, then the district court shall order a new trial limited to the issue of full damages.14 Although this remittitur is not insubstantial, we regard it as both necessary and appropriate under the circumstances. See, e.g., K- ___ ____ __ B Trucking Co. v. Riss Int'l Corp., 763 F.2d 1148, 1162-63 (10th ______________ ________________ Cir. 1985); Goldstein v. Manhattan Indus., Inc., 758 F.2d 1435, _________ ______________________ 1448 (11th Cir.), cert. denied, 474 U.S. 1005 (1985); Dixon v. _____ ______ _____ International Harvester Co., 754 F.2d 573, 590 (5th Cir. 1985); ___________________________ Irene D. Sann, Remittiturs (and Additurs) in the Federal Courts, _________________________________________________ 38 Case W. Res. L. Rev. 157, 188 (1987) (observing that, where "the erroneously excessive portion of the jury verdict is a liquidated amount that is, where the source of error is identifiable and the measure of damages traceable to the error is calculable . . . a remittitur of a small portion of the jury verdict would be appropriate because the error can be identified and corrected"). IV. OBSTINACY IV. OBSTINACY Our final inquiry centers around the district court's award of attorneys' fees ($1,500,000) and prejudgment interest ($6,843,379.42), based on its finding that Pritzker displayed obstinacy. See Dopp III, 831 F. Supp. at 951 (citing P.R.R. Civ. ___ ________  ____________________ 14If the issue of full damages is tried anew, then Dopp shall again be afforded the opportunity, at the appropriate time, to elect between full damages and annulment. If, however, Dopp were to elect annulment, he would receive no accessory damages, as we see no basis for disturbing the special finding of the jury to this effect, see Dopp III, 831 F. Supp. at 942 n.5. ___ ________ 32 P. 44.1(d), 44.3(b)).15 Pritzker assigns error, arguing that he was not obstinate within the meaning of the rules. We find merit in Pritzker's plaint and nullify the awards. Hence, we do not reach Dopp's contention that the court used too miserly an interest rate. A. Legal Principles. A. Legal Principles. ________________ In a diversity case in which the substantive law of Puerto Rico supplies the basis of decision, a federal court must give effect to Rules 44.1(d) and 44.3(b) of the Puerto Rico Rules of Civil Procedure. See, e.g., De Leon Lopez v. Corporacion ___ ____ ______________ ___________ Insular de Seguros, 931 F.2d 116, 126 (1st Cir. 1991). These __________________ rules speak in imperatives. Thus, the imposition of attorneys' fees and prejudgment interest is obligatory once a threshold finding brings the rules into play. See Fernandez v. San Juan ___ _________ ________  ____________________ 15Rule 44.1(d) provides in relevant part: In the event any party or its lawyer has acted obstinately or frivolously, the court shall, in its judgment, impose on such person the payment of a sum for attorney's fees which the court decides corresponds to such conduct. P.R. Laws Ann. tit. 32, app. III R.44.1(d) (1984 & Supp. 1989). With certain exceptions not applicable here, Rule 44.3(b) provides that: [T]he court will . . . impose on the party that has acted rashly the payment of interest . . . from the time the cause of action arises in every case of collection of money and from the time the claim is filed in actions for damages until the date judgment is pronounced. . . . P.R. Laws Ann. tit. 32, app. III R.44.3(b) (1984 & Supp. 1989). 33 Cement Co., 118 D.P.R. 713 (1987). The two rules operate ___________ differently, however, in at least one salient respect: while Rule 44.3(b) provides for determining the amount of prejudgment interest in a mechanical fashion, specifying the period for which interest is to be imposed and the interest rate to be used, Rule 44.1(d) vests the court with considerable discretion in determining the amount of attorneys' fees to be bestowed. A threshold finding of obstinacy brings both rules into play. To be sure, the rules themselves use slightly disparate terminology in describing the prerequisites to their operation. Rule 44.1(d) speaks of parties who act "obstinately"; the official translation of Rule 44.3(b) speaks of parties who act "rashly"; and the official Spanish version of Rule 44.3(b) uses the word "temeridad" a term that "is more appropriately translated as `temerity,'" Dopp III, 831 F. Supp. at 951 n.9. We ________ regard these linguistic differences as inconsequential, for the case law makes it transpicuously clear that the legally operative conduct under both rules is that of obstinacy. See De Leon ___ _______ Lopez, 931 F.2d at 126-27 (citing other cases); see also _____ ___ ____ Fernandez, 118 D.P.R. 713 (noting that interest and attorneys' _________ fees will both be assessed "when the losing party has been obstinate"). We hold, therefore, that obstinacy is the linchpin of a determination under both Rule 44.1(d) and Rule 44.3(b). The court below, which equated rashness and temerity with obstinacy, see Dopp III, 831 F. Supp. at 951 n.9, thus employed the proper ___ ________ standard. 34 The rudiments of obstinacy are more or less straightforward: A finding of obstinacy requires that the court determine a litigant to have been unreasonably adamant or stubbornly litigious, beyond the acceptable demands of the litigation, thereby wasting time and causing the court and the other litigants unnecessary expense and delay. De Leon Lopez, 931 F.2d at 126; accord La Playa Santa Marina, ______________ ______ _______________________ Inc. v. Chris-Craft Corp., 597 F.2d 1, 7 (1st Cir. 1979); Rivera ____ _________________ ______ v. Rederi A/B Nordstjernan, 456 F.2d 970, 975 (1st Cir.), cert. _______________________ _____ denied, 409 U.S. 876 (1972); Soto v. Lugo, 76 P.R.R. 416, 419 ______ ____ ____ (1954). The purpose behind the rules is to penalize "a losing party that because of his stubbornness, obstinacy, rashness, and insistent frivolous attitude has forced the other party to needlessly assume the pains, costs, efforts, and inconveniences of a litigation." Fernandez, 118 D.P.R. 713; see also Reyes v. _________ ___ ____ _____ Banco Santander de P.R., N.A., 583 F. Supp. 1444, 1446 (D.P.R. ______________________________ 1984). In fine, the rules are aposematic in the first instance, and, if their warnings are not heeded, the resultant imposts are intended to punish the offending party as well as to recompense those who are victimized by the offender's recalcitrance. Consequently, under the rules at issue here, attorneys' fees and prejudgment interest cannot be imposed merely to reward a successful litigant; rather, such premiums are payable only if the offending party's behavior "result[s] in a litigation that could have been avoided"; or if the behavior 35 "prolongs [the litigation] needlessly"; or if it "obliges the other party to embark on needless procedures." Fernandez, 118 _________ D.P.R. 713 (citations omitted). B. Standard of Review. B. Standard of Review. __________________ The very nature of a trial judge's interactive role assures an intimate familiarity with the nuances of ongoing litigation a familiarity that appellate judges, handicapped by the sterility of an impassive record, cannot hope to match. The standard of appellate review often recognizes this disparity. So it is here: "[w]e review the trier's determination of whether a party has been obstinate in a deferential manner, using an abuse- of-discretion approach." De Leon Lopez, 931 F.2d at 127; accord _____________ ______ Quinones-Pacheco v. American Airlines, Inc., 979 F.2d 1, 7 (1st ________________ _______________________ Cir. 1992); Marshall v. Perez Arzuaga, 828 F.2d 845, 852 (1st ________ ______________ Cir. 1987), cert. denied, 484 U.S. 1065 (1988). _____ ______ We have fashioned a framework for gauging claimed abuses of discretion: In making discretionary judgments, a district court abuses its discretion when a relevant factor deserving of significant weight is overlooked, or when an improper factor is accorded significant weight, or when the court considers the appropriate mix of factors, but commits a palpable error of judgment in calibrating the decisional scales. United States v. Roberts, 978 F.2d 17, 21 (1st Cir. 1992); accord _____________ _______ ______ Foster v. Mydas Assocs., Inc., 943 F.2d 139, 143 (1st Cir. 1991); ______ ___________________ Independent Oil & Chem. Workers of Quincy, Inc. v. Proctor & ___________________________________________________ _________ Gamble Mfg. Co., 864 F.2d 927, 929 (1st Cir. 1988). _______________ 36 As its language suggests, the abuse-of-discretion framework constitutes a substantial obstacle for appellants who consider themselves aggrieved by discretionary decisions of the district court; most such appellants are destined to leave this court empty-handed. This is as it must be, especially in light of the vastly different relationships between the district court and the events of an actual trial, on the one hand, and the court of appeals and those same events, on the other hand. This is not to imply, however, that an appellate tribunal may merely rubber- stamp a district judge's discretionary determinations. Though abuse of discretion is a relatively relaxed standard of review, it is a standard nonetheless, and the court of appeals will interject itself if the trial court does not meet its measure. C. Analysis. C. Analysis. ________ The court below cited three occurrences in support of its finding of obstinacy: (1) the deceit and duress found by the jury in the first trial to have been practiced by Pritzker during the early stages of his dealings with Dopp; (2) Pritzker's appeal from the verdict rendered by the first jury; and (3) Pritzker's steadfast claim that Dopp's full damages amounted to no more than $35,000. See Dopp III, 831 F. Supp. at 951. We think it is ___ ________ evident from this account that the district court lost its way. In the pages that follow, we set forth our rationale. Perhaps most important, there is no sign that the court factored into the decisional calculus the overall nature of the litigation, or that it placed Pritzker's conduct within the 37 context of the case as a whole. Prosopopoeially speaking, each case, like each individual, has a personality distinct from that of all others. A case's personality is important in evaluating claims of obstinacy because, just as obstinacy may be found to characterize a party's conduct at one stage of a particular case but not necessarily at another, see Carrillo v. Sameit Westbulk, ___ ________ _______________ 514 F.2d 1214, 1220 (1st Cir.), cert. denied, 423 U.S. 1014 _____ ______ (1975), so may obstinacy be found to characterize a particular form of conduct in one case but not in another. In making a determination of obstinacy under P.R.R. Civ. P. 44, therefore, it is wise for the trier to take into account the case's personality.16 This course becomes imperative when the court is confronted with a case that has a highly distinctive personality. This is such a case. The district court described it as involving "difficult and protracted legal battles." Dopp III, ________ 831 F. Supp. at 940. This understates the matter. Here, the stakes are high, the issues tangled, the law tenebrous, and the litigants relentless. The nature of the performance sought and the multiplicity of parties and interests contribute to the  ____________________ 16Our own precedents afford a testament to the importance of correctly characterizing the nature of the litigation for the purpose of discerning obstinacy. In La Playa Santa Marina, a ______________________ dealer sued a manufacturer. Following a bench trial, the district court found the manufacturer liable for damages, 597 F.2d at 3-4, and, in addition, awarded attorneys' fees due to the manufacturer's "obvious temerity in the defense of this suit." Id. at 7. We reversed the fee award, observing that the ___ underlying dispute was one characterized by "close questions and sharp conflicts in the evidence on both liability and damages." Id. ___ 38 case's uniqueness. In view of these realities, we are of the opinion that the trial court had an inescapable obligation to gauge the culpability of Pritzker's conduct accordingly. In failing to undertake such an evaluation, the district court abused its discretion. We believe that the court compounded this error of omission by slipping into various errors of commission. In the first place, the court used too wide a temporal horizon. Obstinacy depends on a party's conduct in the course of ___________________ litigation. See, e.g., De Leon Lopez, 931 F.2d at 126 __________ ___ ____ _______________ (indicating that the rules prohibit obstinacy "during the course of a lawsuit"). Thus, the fact that Pritzker practiced deceit and duress during the events antecedent to the litigation could not trigger Rule 44. In the second place, we do not believe that, in the circumstances of this case, Pritzker's appeal from the first jury's verdict constituted sanctionable conduct. The district court thought that it was proper to penalize Pritzker for taking the appeal because he "thereby caus[ed] significant additional expenditures by the plaintiff, only to have the amount of the verdict against him increased by the second verdict." Dopp III, ________ 831 F. Supp. at 951. We find such a conclusion indefensible in light of the appeals simultaneously taken by Dopp and several other parties from the first jury verdict; the fact that Pritzker's appeal succeeded at least in part, prompting us to erase the original remedial scheme and to order a partial new 39 trial; and, finally, the uncertainty and complexity that surrounded the issue of Dopp's entitlement vel non to resolution. ___ ___ This last point is especially significant because, as a general rule, litigation of a novel but colorable claim cannot, by itself, provide the basis for a finding of obstinacy under P.R.R. Civ. P. 44. See, e.g., Riofrio Anda v. Ralston Purina ___ ____ _____________ ______________ Co., 772 F. Supp. 46, 54 (D.P.R. 1991) ("[W]here, as here, novel ___ issues are raised, a party cannot be held as obstinate."), aff'd, _____ 959 F.2d 1149 (1st Cir. 1992); Marina Indus., Inc. v. Brown ____________________ _____ Boveri Corp., 114 D.P.R. 64 (1983) (similar); Brea v. Pardo, 113 _____________ ____ _____ D.P.R. 217 (1982) (similar). Indeed, even if a party's claim ultimately fails, it cannot be deemed frivolous or obstinate for that reason alone. See Navarro de Cosme v. Hospital Paiva, 922 ___ _________________ ______________ F.2d 926, 934 (1st Cir. 1991); Reyes, 583 F. Supp. at 1445; Felix _____ _____ v. Victory Carriers, Inc., 342 F. Supp. 1386, 1388 (D.P.R. 1972). ______________________ Such a rule is dictated by both common sense and common fairness. Obstinacy must be judged primarily as of the time the conduct is undertaken, not in hindsight;17 and penalizing a party for filing a non-frivolous appeal for no other reason than that the party's position deteriorated, rather than improved, in consequence of the appeal is a paradigmatic misuse of discretion. Finally, we are doubtful that Pritzker's myopic assessment of Dopp's full damages at $35,000 constituted conduct  ____________________ 17That is not to say, however, that a court must close its eyes to subsequent events, for such events sometimes can cast light on what a party knew, or should have known, at the time he acted. 40 violative of Rules 44.1(d) and 44.3(b). Though we readily acknowledge that Pritzker's stated valuation verges on the ludicrous, there is nothing to show that Dopp who even now challenges a $17,000,000 verdict as too paltry, see supra Part ___ _____ III ever placed a more reasonable value on the case, or that a realistic settlement offer by Pritzker would have satisfied Dopp and shortened the proceedings.18 To sum up, this case in its present posture epitomizes the potential risk of overapplication associated with Puerto Rico's obstinacy rules. See Carrillo, 514 F.2d at 1219-20. ___ ________ Because the district court's subsidiary findings do not support its ultimate finding of obstinacy, and because the record does not otherwise show that Pritzker was "unreasonably adamant or stubbornly litigious, beyond the acceptable demands of the _________________________________________ litigation," De Leon Lopez, 931 F.2d at 127 (emphasis supplied), __________ ______________ we have no choice but to vacate the award of attorneys' fees and prejudgment interest. V. CONCLUSION V. CONCLUSION This case has taken on a life of its own. Perhaps its duration is directly proportional to the imputed value of the assets at stake, but, whether or not esurience is the cause of the prolongation, old age inevitably overtakes cases as well as  ____________________ 18Although Dopp's apparent intractability does not in any way justify Pritzker's seeming intransigence two wrongs do not make a right an obstinacy determination must necessarily take the whole picture into account. After all, courts have long believed that, in assaying such matters, "[t]he lemon should not be allowed to reap a reward for calling the grapefruit sour." Quinones-Pacheco, 979 F.2d at 8 n.9. ________________ 41 people. Although we are unable fully to inter the corpus of the litigation today, we have done what we can to move the case toward its final resting place. For the reasons discussed, we affirm the district court's denial of a resultory remedy; conditionally affirm the award of full damages, subject to a remittitur (or, alternatively, a limited new trial) as described in Part III(B), supra; and reverse the award of attorneys' fees and prejudgment _____ interest.19 Affirmed in part, reversed in part, and remanded to the Affirmed in part, reversed in part, and remanded to the _______________________________________________________ district court for further proceedings consistent with this district court for further proceedings consistent with this _________________________________________________________________ opinion. Mandate shall be stayed for the time being, and shall opinion. Mandate shall be stayed for the time being, and shall _______ _______________________________________________________ issue simultaneous with the issuance of mandate in respect to the issue simultaneous with the issuance of mandate in respect to the _________________________________________________________________ three consolidated appeals, namely, Nos. 93-2374, 94-1128, and three consolidated appeals, namely, Nos. 93-2374, 94-1128, and _________________________________________________________________ 94-1129, that are to be the subject of a separate and subsequent 94-1129, that are to be the subject of a separate and subsequent _________________________________________________________________ opinion. Each party shall bear his own costs. opinion. Each party shall bear his own costs. _______ ___________________________________  ____________________ 19To the extent that the parties to these appeals have raised other arguments, some are rendered moot by our rulings, and others are patently meritless. In any event, none requires particularized discussion. 42