<head>

<title>USCA1 Opinion</title>

<style type="text/css" media="screen, projection, print">

<!--

@import url(/css/dflt_styles.css);

-->

</style>

</head>

<body>

                 United States Court of Appeals
                     For the First Circuit
                      ____________________

No. 96-2352

              SERVICIOS COMERCIALES ANDINOS, S.A.,
                     Plaintiff - Appellee,

                               v.

               GENERAL ELECTRIC DEL CARIBE, INC.,
                     Defendant - Appellant.

                      ____________________

          APPEAL FROM THE UNITED STATES DISTRICT COURT

                FOR THE DISTRICT OF PUERTO RICO

        [Hon. Salvador E. Casellas, U.S. District Judge]

                      ____________________

                             Before

                    Torruella, Chief Judge,

                   Cyr, Senior Circuit Judge,

and Pieras, Jr., Senior District Judge.

                     _____________________

   Gordon T. Walker, with whom Heidi A. Chesley and McDermott,
Will & Emery were on brief for appellant.
   Edward M. Borges, with whom Luis Edwin Gonzlez-Ortiz and
O'Neill & Borges were on brief for appellee.

                      ____________________

                        June 12, 1998
                      ____________________

         TORRUELLA, Chief Judge.  This appeal revolves around a
breach of contract claim governed by Peruvian law.  Defendant
General Electric del Caribe, Inc. ("GE del Caribe") appeals from
the September 20, 1996, judgment of the district court finding it
liable for the breach of a contract to purchase 1,000 metric tons
of Pima cotton from the plaintiff, Servicios Comerciales Andinos,
S.A. ("SECOMAN"), a Peruvian partnership.  Following a bench trial,
the district court found for SECOMAN, awarded damages for loss of
profits caused by the breach, and ordered GE del Caribe to pay a
portion of SECOMAN's attorneys' fees as a sanction under P.R. R.
Civ. P. 44.1 for its obstinate conduct during litigation.  GE del
Caribe appeals the finding of breach, the determination of damages,
and the imposition of sanctions.  We affirm in part and reverse in
part.
I.  Background
         We recite the facts in the light most favorable to the
district court's findings of fact.  See Wainwright Bank & Trust Co.v. Boulos, 89 F.3d 17, 18 (1st Cir. 1996).
         SECOMAN had been engaged in the purchase and resale of
Tanguis cotton since its founding in 1977.  Until 1989, SECOMAN was
licensed to sell cotton only inside Peru.  At that time, SECOMAN
attempted to enter the international cotton market, first by
obtaining a license to export cotton from Peru, and then by
entering into a joint venture with another Peruvian business to buy
cotton and resell it on the international market.  The joint
venture focused on Pima rather than Tanguis cotton because Pima
cotton is of higher quality and is generally in greater demand.  
Moreover, at the time there was a substantial differential between
the price at which Pima cotton could be purchased from cotton
producers in Peru and the international market price.  In order to
build a stock of cotton for export, SECOMAN obtained lines of
credit, totaling $2,000,000, from various Peruvian banks.  In the
fall of 1989, SECOMAN began to purchase Pima cotton.
         GE del Caribe, a corporation organized under the laws of
Puerto Rico, is a subsidiary of the GE Supply Company, based in
Connecticut, which is in turn a division of the General Electric
Company.  As its name suggests, GE del Caribe is engaged in the
sale of General Electric products in the Caribbean, Central
America, and South America.  Mr. Enrique Aranda, a Peruvian
national, was the president of GE del Caribe from 1986 to 1993.  In
1990, he was trying to increase his company's sales by penetrating
different Latin American markets.  
         In early 1990, Mr. Aranda spoke with a friend in Peru,
Mr. Huertas del Pino, who was the president of Carmel Export
Agency, Inc. ("Carmel"), and who informed him that through his
contacts there, he could facilitate GE del Caribe's expansion into
that market.  In particular, Mr. Huertas had a business
relationship with Horizon Trading, Inc. ("Horizon"), a Peruvian
entity established in the Cayman Islands and engaged in the export
of Peruvian products.
         Around the same time, Horizon was informed that there was
a seller on the market ready to provide 1,000 tons of Pima cotton
for sale at $1.70 per pound, and that the seller was willing to pay
a commission on the sale.  Horizon communicated this information,
as well as the fact that the international price for Pima cotton
was $2.40 per pound, to Mr. Huertas, who replied that he believed
that he could find a buyer.
         That person was Mr. Aranda.  Mr. Huertas arranged for a
meeting to take place in Peru between Mr. Aranda and several
Peruvian businessmen who were interested in exporting cotton and
other Peruvian products.  In preparation for the meeting,
Mr. Aranda requested that both Mr. Huertas and a GE del Caribe
employee provide him with information regarding the cotton market.  
He received samples of SECOMAN's Pima cotton, and began to research
the possibility of reselling the cotton abroad.
         The meeting was held on Friday, March 23, 1990, at the
Caesar's Palace Hotel in Lima, Peru.  Among those present was
Mr. Alfredo Gordillo, general manager and 90% owner of SECOMAN.  At
the meeting, Mr. Aranda told Mr. Gordillo that he was interested in
purchasing the cotton that SECOMAN had in stock.  Although
Mr. Gordillo was offering only 600 tons, when asked whether he
could supply more he stated that he could export up to a total of
1,000 tons, at $1.72 per pound.  After the meeting, Mr. Aranda
called Mr. Gordillo and insisted that the two of them meet again
the following day to discuss the transaction.   
         At the second meeting, held in Mr. Gordillo's office,
Mr. Aranda and Mr. Gordillo negotiated the details of an agreement
pursuant to which GE del Caribe would purchase 1,000 tons of Pima
cotton from SECOMAN.  Among other things, Mr. Gordillo agreed to
Mr. Aranda's request that the asking price be reduced to $1.58 per
pound.  Payment was to be made by a negotiable letter of credit,
with a face value of $2,800,000, which would be submitted to
SECOMAN for its approval.  GE del Caribe was also to make an
initial deposit of $100,000 in Mr. Gordillo's account in a Miami,
Florida bank.  As they had discussed the day before, SECOMAN had
600 tons of Pima cotton in stock and ready to ship immediately.  
Mr. Aranda agreed to allow SECOMAN an additional two weeks to
purchase and ship the extra 400 tons.   
         Mr. Gordillo also asked Mr. Aranda whether he had pre-
sold the cotton.  Mr. Aranda replied that he had not, but that he
had some prospects.  Mr. Aranda asked Mr. Gordillo for the names of
some of SECOMAN's clients, which Mr. Gordillo agreed to do if
Mr. Aranda's prospective buyers did not purchase the cotton.  
Mr. Gordillo also offered SECOMAN's services as a sales agent for
GE del Caribe, given SECOMAN's greater expertise in the cotton
market.  Mr. Aranda agreed, but only on condition that SECOMAN not
offer the same cotton for sale without GE's prior written
authorization.  Finally, Mr. Gordillo asked Mr. Aranda to have GE
del Caribe confirm his authority to enter into the agreement.
         Because it was a Saturday, Mr. Gordillo did not have
secretarial assistance in the office, and he therefore suggested
that the agreement be drafted at a later date.  Mr. Aranda stated,
however, that he would rather have a document drafted immediately,
and then proceeded to type up the substance of their agreements in
English in a document entitled "Agreement to Purchase"
("Agreement").  Both of them then signed the Agreement.
         Initially, the parties began to perform their respective
duties under the Agreement.  Thus, on March 29, 1990, GE's Vice
President of Finance sent a letter by facsimile to SECOMAN
ratifying the Agreement, indicating that Mr. Aranda was "authorized
by GE del Caribe to negotiate and conclude business deals such as
the one we have concluded on March 24 with [SECOMAN]."  On
April 20, 1990, GE del Caribe deposited the agreed-upon $100,000 in
Mr. Gordillo's bank account.  SECOMAN, in the meantime, began
purchasing additional Pima cotton to comply with its duty to
provide a total of 1,000 tons of cotton.
         Mr. Aranda had also immediately begun to seek buyers for
the cotton at $1.90 per pound.  However, by April 5, 1990, he had
not yet found any buyers, so on that day he wrote to SECOMAN
indicating that the sale of the cotton was taking longer than
foreseen and requesting an additional eight working days to
conclude the sale.  At the same time, Mr. Huertas was also
negotiating the sale of 1,000 tons of Pima cotton at $1.90 per
pound.  Mr. Huertas also required the prospective buyer to make a
$100,000 deposit.  Although Mr. Huertas claimed that it was merely
a coincidence that he was offering Pima cotton for sale on the same
terms as GE del Caribe, the district court found that Mr. Huertas
had no cotton of his own, but was instead helping Mr. Aranda to
find a buyer for the cotton that GE del Caribe had purchased from
SECOMAN.   
         Throughout the late spring and early summer of 1990, the
international market price for Pima cotton was steadily dropping,
dooming Mr. Aranda's efforts to sell the cotton that GE del Caribe
had purchased from SECOMAN.  For example, on May 14, 1990,
Mr. Aranda contacted again a potential purchaser who had offered to
buy the cotton at $1.70 per pound, but had originally been turned
down because GE del Caribe was asking for $1.90 per pound.  Even
though Mr. Aranda lowered the sale price to $1.73 per pound, the
offeree rejected the offer noting that the world price had dropped
even further.
         In mid-April, Mr. Aranda began to visit banks in Puerto
Rico to obtain the letter of credit that was due under the
Agreement.  At that time, he had not yet informed his superiors of
his trip to Peru, of the existence of the Agreement, or of his
efforts to sell the cotton.  The banks, however, would not issue a
letter of credit without a guarantee, or "letter of comfort," from
GE's parent company.  Therefore, in early May, Mr. Aranda sought
the assistance of his superiors in GE Supply Co., explaining that
GE del Caribe needed the letter of comfort in order to obtain the
letter of credit that SECOMAN was to receive pursuant to the
Agreement.  He also explained that GE del Caribe stood to gain
$300,000 on the sale of the cotton.
         Mr. Aranda's superiors, however, refused to issue the
letter of comfort, instructed him not to comply further with the
Agreement, and began to investigate the matter.  On May 23, 1990,
Mr. James Ambrose, who was the Chairman of the Board of Directors
of GE del Caribe as well as an officer in GE Supply, flew to Puerto
Rico to discuss the Agreement with Mr. Aranda.  Mr. Ambrose
expressed his displeasure over the fact that Mr. Aranda had
committed GE del Caribe to this transaction without the approval of
the Board of Directors.  At its next meeting, the Board reprimanded
Mr. Aranda for his actions.
         The district court concluded that from that point on, GE
del Caribe sought ways to shirk its duties under the contract.  In
particular, after much delay, GE del Caribe sent SECOMAN a
revocable letter of credit.  SECOMAN rejected the proffered letter
and requested, instead, a confirmed, irrevocable letter of credit.  
On June 11, 1990, GE del Caribe wrote to SECOMAN claiming that
SECOMAN's rejection of the proffered letters was an essential
breach of the contract that entitled GE del Caribe to resolve the
Agreement.  However, the district court determined that SECOMAN had
not breached any obligation in rejecting the revocable letter of
credit, since such a letter did not satisfy the requirement,
imposed by the Agreement, that GE del Caribe produce a negotiableletter of credit because only irrevocable letters of credit can be
negotiable.  The district court further determined that GE del
Caribe's violation of this aspect of the contract was willful and
in bad faith, since it knew that the Agreement required that the
letter of credit be irrevocable.
         GE del Caribe's initial delay and eventual failure to
procure an irrevocable letter of credit not only deprived SECOMAN
of its expected profit on the Pima cotton transaction, but also
started a chain reaction that devastated SECOMAN's finances.  GE
del Caribe's failure to tender a negotiable letter of credit
rendered SECOMAN unable to meet its obligations under the lines of
credit it had opened the year before.  SECOMAN was then reported to
the Superintendent of Banks and Insurance of Peru for its failure
to meet these obligations and placed on a list of defaulting
entities.  The listing prevented SECOMAN from obtaining any further
financing, which in turn prevented SECOMAN from purchasing the
additional cotton that it was required to deliver under two
different contracts with other parties.  Because of its breach of
its obligations under these contracts, the buyers filed demands for
arbitration against SECOMAN.  Awards were entered against SECOMAN
in both arbitrations.  Thus, in addition to losing its expected
profits on those contracts, SECOMAN was ordered to pay damages to
the buyers.  Finally, the cumulative effect of these losses was to
reduce SECOMAN's value as a going concern.
         SECOMAN subsequently filed suit against GE del Caribe for
breach of contract in the U.S. District Court for the District of
Puerto Rico, alleging alienage jurisdiction under 28 U.S.C.
1332(a)(2).  Before trial, the parties stipulated that their
dispute was governed by Peruvian law.  After an extensive bench
trial, the district court determined that GE del Caribe had not
only breached the Agreement, but also that it had done so with
"dolo" or dolus -- that is, in bad faith.  Under Peruvian contract
law, a defendant who breaches a contract in bad faith is liable for
all damages proximately caused by the breach, including
unforeseeable damages.  See Cdigo Civil (C. Civ.) art. 1321
(Peru).  Accordingly, the district court's award of damages to
SECOMAN included its loss of profits on the sale of cotton to GE
del Caribe, as well as all other losses it suffered as a
consequence of the breach.  Finally, the district court required GE
del Caribe to pay a certain portion of SECOMAN's attorney's fees,
as a sanction for GE's obstinate conduct.  GE del Caribe then filed
the appeal that is now before us.
II.  Standard of Review
         We review de novo a district court's conclusions of law.  
See Exxon Corp. v. Esso Workers' Union, Inc., 118 F.3d 841, 844
(1st Cir. 1997).  In this regard, a district court's determination
of foreign law "shall be treated as a ruling on a question of law."  
Fed. R. Civ. P. 44.1.  In contrast, "[i]n all actions tried upon
the facts without a jury," a district court's "[f]indings of fact,
whether based on oral or documentary evidence, shall not be set
aside unless clearly erroneous, and due regard shall be given to
the opportunity of the trial court to judge the credibility of the
witnesses."  Fed. R. Civ. P. 52(a); see La Esperanza de P.R., Inc.v. Prez y Ca. de P.R., Inc., 124 F.3d 10 (1st Cir. 1997).  "We
will conclude that a finding is clearly erroneous only when, after
reviewing the entire record, we are left with the definite and firm
conviction that a mistake has been committed."  Strahan v. Coxe,   
127 F.3d 155, 172 (1st Cir. 1997), petition for cert. filed, 66
U.S.L.W. 3605 (U.S. Mar.  6, 1998) (No.  97-1485) (citations
omitted).
         Some questions presented to a trial court, however, are
neither pure questions of law nor of fact.  We review "mixed"
questions of law and fact "along a degree-of-deference continuum,
ranging from plenary review for law-dominated questions to
clear-error review for fact-dominated questions."  Inmates of
Suffolk County Jail v. Rouse, 129 F.3d 649, 661 (1st Cir. 1997),
petition for cert.  filed, 66 U.S.L.W. 3531 (U.S. Feb.  4, 1998)  
(No. 97-1278) (quoting Johnson v. Watts Regulator Co., 63 F.3d
1129, 1132 (1st Cir. 1995)).  Thus, "the applicable standard of
review varies depending upon the nature of the mixed question; the
more fact-dominated it is, the more likely that deferential,
clear-error review will obtain, and the more law-dominated it is,
the more likely that non-deferential, de novo review will obtain."  
Sierra Fra Corp. v. Donald J. Evans, P.C., 127 F.3d 175, 181 (1st
Cir. 1997).
         Contract interpretation often presents mixed questions of
law and fact.  We thus employ a bifurcated standard in reviewing a
district court's interpretation of a contract.  See Boston Car Co.v. Acura Auto. Div., Honda Motor Co., 971 F.2d 811, 815 (1st Cir.
1992).  On the one hand, "it is for the court to determine whether
the terms of an integrated agreement are unambiguous and, if so, to
construe them according to their plain meaning."  United States
Liab. Ins. Co. v. Selman, 70 F.3d 684, 687 (1st Cir. 1995).  
Appellate review of such determinations is, accordingly, de novo.  
See id.  On the other hand, "when the district court's answers rest
not on plain meaning but on differential findings by the trier of
fact, derived from extrinsic evidence as to the parties' intent
with regard to an uncertain contract provision, appellate review
proceeds under the 'clearly erroneous' standard."  Id.; see alsoICC v. Holmes Transp. Inc., 983 F.2d 1122, 1126 (1st Cir. 1993);
Gel Sys., Inc. v. Hyundai Eng'g & Constr. Co., 902 F.2d 1024, 1027
(1st Cir. 1990).
III.  Analysis
         A.  Breach of Contract
         GE del Caribe contends that the district court erred in
determining that it breached its obligations under the "Agreement
to Purchase," for the simple reason that the Agreement was not a
final and binding contract under the law of Peru.  In support of
its claim, GE del Caribe points out three different flaws in the
Agreement that arguably prevent it from being a binding contract.  
First, GE del Caribe claims that the Agreement fails to comply with
C. Civ. art. 1359, which provides that "[n]o contract exists as
long as the parties do not agree with all of its stipulations, even
if the discrepancy is secondary," because the Agreement lacks an
undertaking to purchase, a price term, a delivery term, and an
agreement on the terms for the letter of credit.  Second, GE del
Caribe contends that the district court's reliance on evidence
extrinsic to the Agreement, particularly in determining that the
Agreement's "facilitation" clause contained a drafting error, was
ultra vires because, under Peruvian law, a court may not use
extrinsic evidence to interpret a contract, let alone to rewrite
its clear and unambiguous terms.  Third, and finally, GE del Caribe
asserts that the district court erred in rejecting GE del Caribe's
argument that the Agreement was invalid because its purpose was
unlawful.   
           1.  Conclusions of Law   
         In its first two arguments, GE del Caribe implicitly
contends that the district court erred both by failing to apply
correctly the rules of contractual hermeneutics required by the
Peruvian Civil Code, and by finding ambiguity in the terms of the
contract when there was none.  However, GE del Caribe's arguments
are also based in part on claims that the district court
misapprehended the evidence.  As we discussed above, we review de
novo the district court's determinations of Peruvian law and of the
ambiguousness of the terms of the Agreement, but we review the
court's findings of fact only for clear error.  For the sake of
clarity and convenience, we first address the questions of law and
of contractual hermeneutics, and only then pass on to evaluate the
district court's findings of fact.
              a. Terms of the Agreement  
         GE del Caribe's first argument begins with the claim that
C. Civ. art. 1359 establishes that there can be no contract if the
parties have not reached an agreement as to every element of the
contract, whether primary or secondary.  This assumes that a lackof agreement as to any contractual terms, as opposed to a
disagreement, is enough to prevent a contract from arising.  
Contending that the Agreement lacked an undertaking to purchase and
reflected no agreement on price, date of delivery, or the essential
terms of the letter of credit, GE del Caribe concludes that there
was no contract.
         GE del Caribe's argument is subtly but seriously flawed.  
The fundamental problem is that, contrary to GE's assertions,
Article 1359 does not require the affirmative agreement of the
parties as to each and every term of a contract.  Instead, Article
1359 distinguishes between essential and non-essential terms,
requiring affirmative agreement as to essential terms, but merely
requiring that there be no disagreement as to non-essential terms.  
See Manuel de la Puente y Lavalle, El Contrato en General[Contracts in General], Pt. 1, Tome 1, at 397-98 (Lima, Peru
1993).
    Silence as to an essential term is fatal; that is to say,
there can be no contract unless the parties have affirmatively
agreed to the essential terms of the contract.  The crucial problem
is determining which terms are essential and which are not.  As one
commentator has noted, some terms are objectively essential, while
others are only subjectively essential.  See id. at 392.  
Objectively essential terms are those elements of a contract that
are made necessary by the very nature of the contract, without
regard to the parties' subjective intent.  See id.  Of course, the
difficulty of the task of determining which elements are
objectively essential depends on the type of contract involved:
         Notwithstanding that it is relatively
         difficult to establish, as a general rule,
         just which are the essential terms of each
         [type of] contract, the task is easier
         when it involves those types of contracts
         that are defined by law, such as the
         contracts [] defined in the Peruvian Civil
         Code. . . .  Thus, for example, insofar as
         Article 1529 of the Code defines the
         contract of sale as the contract whereby a
         seller binds himself to transfer the
         ownership of a good to a buyer, and the
         latter to pay a price in money, the
         essential terms of that contract are the
         good  and the price. . . .  The problem is
         more delicate with regard to atypical
         contracts, in which, because of a lack of
         [legislative] definition, it is hardly
         possible to determine which contractual
         obligations are essential and which are
         secondary. . . .  [I]t is therefore
         necessary to analyze, case by case, the
         business purpose of the contract so as to
         determine which obligations are
         indispensable for its success: such
         obligations will constitute the essential
         elements of the contract.

M. de la Puente y Lavalle, El Contrato en General [Contracts in
General], Pt. 1, Tome 1, at 392 (emphasis supplied). Subjectively
essential terms, in contrast, are those which, even though they are
not objectively essential, are deemed to be essential by the
contracting parties.  See id.  For example, although a delivery
term is not objectively essential to a contract of sale (for
reasons discussed below), the parties to such a contract may very
well consider these essential to the negotiations.  The question
whether a particular term is subjectively essential presents a
issue of fact.
    Silence with regard to non-essential terms, in contrast,
is not fatal because the Civil Code's norms regarding contracts
"are suppletory to the will of the parties, save for those that are
imperative."  C. Civ. art. 1356.  Article 1356 must be read in
conjunction with C. Civ. art. 1354, which, in stating that "[t]he
parties may freely determine the content of a contract, so long as
it is not contrary to any imperative legal norms," establishes a
distinction between the imperative and optional provisions of the
Civil Code.  Optional norms are presumed to apply to a given
contract, but parties may elect otherwise, whereas the parties may
not opt out of imperative norms.  Stated differently, a contract
is subject to all imperative norms, as well as any optional norms
not excluded by the parties.   
    Thus, the parties' silence as to any non-essential term
is not fatal under Article 1359 because the Code's optional norms
provide the missing terms.  In contrast, if rather than silence we
find disagreement as to any such term, then there can be no
contract, because the fact that there is a dispute over a given
term rebuts the presumption that the parties would consent to the
incorporation of the Code's suppletory norms.
    As noted before, GE del Caribe claims that the Agreement
to purchase was not a contract because it lacked an undertaking to
purchase, a price term, a delivery term, and an agreement on the
terms for the letter of credit.  The claim fails, for a variety of
reasons.  With regard to the two essential terms that GE del Caribe
contends were missing, these were found by the district court to be
present.  For example, the alleged lack of an explicit undertaking
to purchase is irrelevant because the district court found that
such an undertaking was implicit in the Agreement.  Similarly, the
district court found that the line in the Agreement stating "Cost
offered per pound: $1.58 USD" was an explicit price term.
    The lack of an explicit agreement on the time and place
of delivery does not prevent a contract from arising in this case.
The delivery term is not objectively essential to a contract of
sale because C. Civ. arts. 1552 and 1553 provide default rules
governing the time and place of delivery.  Moreover, there is no
evidence on the record that the delivery term was subjectively
essential, and articles 1552 and 1553 are not excluded either
explicitly or implicitly by the terms of the Agreement to Purchase.  
Consequently, these provisions are applicable to this contract.
    Finally, the argument based on the letter of credit is
also unconvincing.  The method of payment is not an objectively
essential term of a contract of sale.  Moreover, although the
parties to a sales contract could consider the method of payment to
be subjectively essential, there is no indication that such was the
case here.  In particular, reviewing the text of the Agreement, we
find no stipulation that the content of the letter was to be the
sine qua non of the Agreement.  
    The specific content and format of the letter of credit
were thus secondary, non-essential terms of the Agreement.  As
discussed above, only disagreement as to such terms is fatal under
Article 1359.  The problem here is that the text of the Agreement
does not indicate the existence of a disagreement, or even that the
parties agreed to leave the specifics of the letter of credit open
for future negotiation.  Specifically, it is not clear to us that
the requirement that a draft of the letter be submitted to SECOMAN
for its approval necessarily means that the parties had not already
agreed upon the content of the letter.  To the contrary, the
requirement may very well have been intended merely to allow
SECOMAN the opportunity to ensure that the letter of credit was
drafted in accordance with the terms already agreed upon.  
Accordingly, it fell upon GE del Caribe to prove to the district
court by a preponderance of the evidence that the parties had
agreed to postpone their negotiation over the details of the letter
of credit.  The district court, however, found that GE del Caribe
failed to carry that burden.
              b.  Redrafting of the "facilitation" clause and
              consideration of extrinsic evidence

    The clause in question states: "The SELLERS guarantee the
following: . . . That the SELLERS will use GE del Caribe as
facilitators and sales consultants during this transaction.  
SELLERS will not negotiate sale of the lot aforementioned without
the written agreement of GE del Caribe."  The district court found
that this clause was not consistent with the most natural reading
of the rest of the Agreement, which otherwise seemed to be a
contract for the sale of cotton.  Moreover, SECOMAN presented
evidence that the "facilitation" clause had been incorrectly
drafted by Mr. Aranda, because the actual agreement between Mr.
Gordillo and himself provided that SECOMAN would act as facilitator
and sales consultant for GE del Caribe, not the other way around.  
The district court believed this evidence, and ruled accordingly.  
    GE del Caribe claims, however, that Peruvian law
prohibits courts from using extrinsic evidence to rewrite the clear
and unambiguous terms of an agreement, and therefore that the
district court's determination that the Agreement's "facilitation"
clause contained a drafting error was ultra vires.  Although
agreeing with the court that the "facilitation" clause was not
consistent with the view that the Agreement was a contract of sale,
GE del Caribe argues that the clause means what it says, that the
court could not ignore the inconsistency, and thus that the only
legally permissible conclusion to be drawn from the inconsistency
was that the Agreement was not a contract of sale.
    GE del Caribe is correct in stating that Peruvian law
does not permit a court to rewrite the clear and unambiguous terms
of a contract; however, Peruvian law does permit a court to inquire
into the common intention of the parties if the terms of the
contract are unclear or ambiguous.  Contrary to GE del Caribe's
assertion, several of the Agreement's provisions are ambiguous and
confusing.  The source of the problem is evident.  GE del Caribe's
argument is premised on the erroneous assumption that a contractual
provision is ambiguous only when its words are literally unclear.  
To the contrary, contractual provisions may be ambiguous, even if
their words are otherwise clear, if their meaning is placed in
question by the context in which they are found.  
    In order to explain our conclusion, we review some basic
concepts of Peruvian contractual hermeneutics.  Pursuant to C. Civ.
art. 1352, "[c]ontracts are perfected by the consent of the
parties, except for those which, in addition, must observe the form
required by law under penalty of nullity."  Thus, Peruvian law does
not require any particular form for contracts, except for certain
specific types of contracts that are not relevant here.  Instead,
the Peruvian Civil Code contains a number of provisions designed to
guide the parties (and the courts) in the interpretation of
contracts, no matter what their form.   
    The most basic of these provisions are C. Civ. arts. 168,
169, and 170, which regulate the interpretation of all "juridical
acts," including contracts.  In particular, Article 168 provides
that "[a] legal act must be interpreted in accordance with its
content and with the principle of good faith,"  Article 169
provides that "[a] clause in a legal act is interpreted in the
light of the other clauses, and those clauses which are dubious are
ascribed the meaning arising from the whole," and Article 170
provides that "[s]tatements that have several meanings must be
understood to have the meaning that is most suitable to the nature
and object of the legal act."  In addition, there are a number of
hermeneutic rules that are specifically applicable to contracts.  
For example, C. Civ. art. 1361 provides that "[c]ontracts are
binding as to what is expressed in them.  It is presumed that the
statements expressed in a contract reflect the common will of the
parties, and whomever denies [that the statements do reflect the
common will] must prove it."  Moreover, C. Civ. art. 1362
emphasizes that "[c]ontracts must be negotiated, executed, and
performed according to the rules of good faith and the common
intent of the parties."  The principle of good faith has been
interpreted to imply, among other things, the principle of
conservation of contracts, which requires that contracts be
interpreted whenever possible in such a way as to preserve their
validity.  See Manuel Miranda-Canales, Derecho de los Contratos[The Law of Contracts], at 33-34 (Lima, Peru 1986).
    As GE del Caribe correctly states, the theory underlying
these provisions is known as the objectivist theory of
interpretation.  See Fernando Vidal-Ramrez, Tratado de Derecho
Civil [Treatise on Civil Law], Tome III, Vol. I, at 395 (Lima, Peru
1990); see generally M. de la Puente y Lavalle, El Contrato en
General, Pt. 1, Tome 1, at 121-52 (from which much of the following
discussion is derived).  However, GE's interpretation of the
objectivist approach is incorrect.  As noted above, although under
Peruvian law a contract is perfected by the consent of the parties,
see C. Civ. art. 1352, consent as a mere subjective mental state
has no legal effect.  Instead, some outward sign of consent, some
declaration of the common will of the parties is required.  
Unfortunately, the possibility then arises that the declaration of
will may not accurately reflect the subjective common will of the
parties.
    Various theories have been developed in order to resolve
the problems that may be caused by this discrepancy.  The two most
influential theories, the subjectivist and the objectivist, seem
also to be diametrically opposed to each other.  The subjectivist
theory requires the parties to subjectively consent to the
contract, and treats the declaration of will merely as evidence of
the subjective will of the parties.  In contrast, pursuant to the
pure version of the objectivist theory, the declaration of will
prevails over the subjective common will of the parties, so that if
the declaration appears to indicate that the parties consented to
the contract, the contract will be upheld even if the parties had
not, in fact, had the requisite subjective intent.
    Although GE del Caribe claims that Peru has adopted the
"pure" version of the objectivist theory, that is clearly not the
case.  To the contrary, the provisions of the Peruvian Civil Code
reflect a less strict version of the objectivist theory, sometimes
referred to as the "reliance" theory.  See M. de la Puente y
Lavalle, El Contrato en General, Pt. 1, Tome 1, at 149-51
(describing the "teora de la confianza"); see also Vidal-Ramrez,
Tratado de Derecho Civil, at 374-78.  In particular, Article 1361
establishes only a rebuttable presumption that the declaration
expressed in the contract reflects the common will of the parties.  
"This approach conserves the benefits of the [objectivist] system,
and, in particular, its security, but it also leaves the way open
for the interpreter to determine the subjective intent of the
declarant," which furnishes evidence of the common will of the
parties.  Id.  
    Thus, notwithstanding GE del Caribe's arguments to the
contrary, it is simply not true that Peruvian law bars courts from
considering evidence extrinsic to the text of an ambiguous or
unclear contract.  A contract is interpreted as a whole (not as a
series of disjointed, independent clauses), and in light of its
nature and purpose.  See C. Civ. arts. 169, 170.  Consequently,
when an individual clause appears to be inconsistent with the
others and with the purpose of the contract, a court is empowered
to inquire further into the common will of the parties.  In doing
so, the court operates under a presumption that the text of the
clause in question reflects the common will of the parties, but the
presumption may be rebutted by evidence to the contrary as to the
common will of the parties.  See C. Civ. art. 1361.  A fortiori,
that evidence can only be evidence that is extrinsic to the
contract.  If the evidence is sufficient to rebut the Article 1361
presumption, the court may enforce the terms of the contract as it
finds that they were agreed to, rather than as they were written.  
See Lavalle-Zago, Contratos at 197-98.
    With regard to the case at hand, we agree with the
district court's conclusion that the "facilitation" clause was not
consistent with the rest of the contract.  The contract was
entitled "Agreement to Purchase," and labeled the parties as
"BUYERS" and "SELLERS."  Most of the other clauses in the contract
were consistent with the interpretation that the Agreement was, in
fact, a contract for the sale of cotton.  The first sentence in the
facilitation clause, however, indicates that SECOMAN is to use GE
del Caribe as a facilitator and sales consultant, which, as both
parties agree, is difficult to reconcile with the view that the
Agreement is a sales contract.
    There are at least two alternative interpretations of
this discrepancy, the one advocated by SECOMAN and adopted by the
district court, and the one espoused by GE del Caribe.  As one
commentator has noted with regard to Article 168, courts are not
required to interpret words literally, "when such an interpretation
would lead to [an] absurd [result] or to contradiction."  Lavalle-
Zago, Contratos at 194.  In this case, both parties'
interpretations may lead to internal contradictions: SECOMAN's
interpretation appears to be contradicted by the first sentence of
the facilitation clause, while GE del Caribe's interpretation
appears to be contradicted by the title of the Agreement and the
nomenclature of the parties used therein.   
    Regardless of which interpretation is correct, we find
that the meaning of the facilitation clause was sufficiently
contentious to make it necessary for the district court to receive
any evidence that was probative of the common will of the parties.  
In this regard, we find no merit in GE del Caribe's claim that the
subsequent conduct of the parties may not be used by a court in
interpreting a contract.  To the contrary, when the meaning of a
contract is unclear, "the entire behavior of the parties must be
observed, before, during, and even after the conclusion of the
contract."  Max Arias-Schreiber, Cdigo Civil Peruano de 1984[Peruvian Civil Code of 1984], Tome I, at 89-90 (Lima, Peru 1986).
         2.  Findings of Fact
    A single reading of the Agreement suggests that the
parties intended to enter into some sort of binding contract.  As
noted before, the Agreement was entitled "Agreement to Purchase,"
labeled the parties "BUYERS" and "SELLERS," indicated the price and
quantity of the cotton being offered, expressed the parties'
various guarantees and obligations in imperative language, and was
signed by the President and Managing Director of GE del Caribe and
SECOMAN, respectively.  At first blush, the Agreement appears to be
a contract for the sale of cotton.   
    Upon examining the Agreement more closely, however, that
initial impression is placed in doubt.  For example, the first
sentence of the Agreement states that the parties are agreeing to
"initiate this agreement to purchase," which could lead one to
question whether the Agreement was merely designed to pave the way
to further negotiations.  Similarly, the Agreement does not
literally state that the sellers will sell the cotton, or that the
buyers will buy it.  Instead, the Agreement indicates that "[t]he
SELLERS guarantee . . . [t]hat they have available to sell a total
of 1000 metric tons of PIMA cotton," and that "[t]he BUYERS agree
. . . that they will produce a letter of credit (negotiable) with
due diligence."  On the basis of the text alone, it is not possible
to establish with certainty that the Agreement contemplates the
immediate sale of cotton to GE del Caribe.  Moreover, as we have
discussed above, it is very difficult to reconcile the text of the
facilitation clause with the view that the Agreement is a contract
for the sale of cotton.
    The district court was faced with the task of making
sense of this unclear text.  GE del Caribe contends that, upon
determining that the text alone was insufficient to establish the
existence of a contract of sale, the court should have ruled that
there was no contract.  As we have explained, however, when a court
is faced with a text such as this, the principle of conservation of
contracts directs the court to look beyond the four corners of the
contract for evidence of the common will of the parties.  After
all, one conclusion that can be drawn with confidence from the text
itself is that the parties intended the Agreement to be binding.  
As GE del Caribe correctly points out, that does not necessarily
mean that the Agreement is a binding contract, because the terms of
the Agreement must comply with the requirements established by
Peruvian contract law.  It does, however, mean that the court may
presume that the Agreement is a contract, and therefore investigate
further to determine what the specific terms of the contract might
be.  During such an inquiry, moreover, the party claiming that the
Agreement is not a contract bears the burden of proof.  See C. Civ.
art. 1361.
    After reviewing the evidence that the district court had
before it, we conclude that its finding that the Agreement to
Purchase was a binding contract for the sale of cotton was not
clearly erroneous.  First, there is substantial evidence indicating
that both SECOMAN and GE del Caribe perceived themselves to be
bound by the Agreement and acted accordingly.  Indeed, it would be
difficult to characterize the evidence that GE del Caribe deposited
$100,000 in Mr. Gordillo's bank account, or that Mr. Aranda made a
substantial effort to obtain a confirmed letter of credit, as
indicating anything but that the parties perceived the Agreement to
be binding.  In addition, GE del Caribe sent SECOMAN a fax
ratifying the Agreement, stating that Mr. Aranda "is authorized by
GE del Caribe to negotiate and conclude business deals such as the
one we have concluded on March 24 with your company."  (Emphasis
supplied).  GE del Caribe's decision to send SECOMAN a letter of
credit, albeit one that did not comply with the Agreement, also
tends to undermine the claim that it did not consider the Agreement
to have any binding force.
    Second, the conclusion that the contract was specifically
one for the sale of cotton is supported by the text of the
Agreement and by the testimony of the plaintiffs and their legal
experts, which the district court found credible.  For example, we
perceive no error in the district court's determination that the
clause stating that the "[c]ost offered per pound: $1.58 USD"
provided the sale price, or in the finding that the reference to
1000 tons of cotton being available indicated that the quantity of
cotton sold was 1000 tons.  The court heard testimony indicating
that these price and quantity terms were the terms of SECOMAN's
offer, and that GE del Caribe accepted the offer by signing the
Agreement.  The fact that the Agreement uses the terms "cost
offered" and "availability" rather than "price for sale" and
"quantity sold" does not necessarily imply that the Agreement was
not a contract of sale.  Moreover, the Agreement was typewritten by
a non-lawyer who, to judge from the fact that he could not wait
until the following working day, was apparently in a hurry to close
the deal.  We thus find that there was sufficient evidence before
the court to allow it to conclude that the Agreement contained
price and quantity terms.
    Similarly, the findings as to the delivery term are
perfectly consistent with the Civil Code's default provisions.  SeeC. Civ. arts. 1552, 1553.  In particular, the Code provides that,
absent a stipulation to the contrary, a good is delivered by making
available to the buyer at the place where it is located.  See C.
Civ. art. 1553.  Accordingly, SECOMAN's agreement to make the
cotton available and ready to ship was sufficient to comply with
its contractual obligation to deliver the cotton.
    The district court also heard testimony indicating that
Mr. Aranda had mis-drafted the facilitation clause, erroneously
transposing the names of GE del Caribe and SECOMAN.  GE del Caribe
argues that such testimony was inherently unreliable, since the
resulting clause would be internally inconsistent.  We disagree.  
The resulting clause would read as follows:
         That GE del Caribe will use SELLERS as
         facilitators and sales consultants during
         this transaction.  SELLERS will not
         negotiate sale of the lot aforementioned
         without the written agreement of GE del
         Caribe.

The district court's reading is not implausible.  Indeed, far from
being internally incoherent, the resulting clause is consistent
with a contract whereby SECOMAN sells cotton to GE del Caribe,
which then resells the cotton.  According to the district court's
understanding of this aspect of the Agreement, although Mr. Aranda
had some potential buyers in mind, SECOMAN agreed to assist GE del
Caribe in its efforts to resell the cotton because of its greater
expertise in the cotton market.  GE del Caribe, however, retained
final authority to approve or reject any offer from a potential
buyer.  Given the evidence heard at trial, we cannot say that it
was clear error for the district court to find that this was the
deal agreed to by Mr. Aranda and Mr. Gordillo.
    Furthermore, it was not clear error for the district
court to find that the Agreement required GE del Caribe to submit
a confirmed letter of credit, based on evidence that, as a matter
of customary practice in international trade and finance, a letter
of credit will not be treated as negotiable unless it is confirmed
by a bank.  Based on this evidence, as well as on evidence that
GE's policy is never to accept an unconfirmed letter of credit
because it is not negotiable, the court also found that GE del
Caribe knew of this customary practice and thus knew that the
Agreement required the letter of credit to be confirmed.  We find
the evidence sufficient to support the court's conclusions.
    In sum, GE del Caribe failed to show that the Agreement
was not a sales contract.  Although GE del Caribe presented some
evidence to the contrary, the evidence on SECOMAN's side was not so
unreliable as to make it unreasonable for the district court to
give it credit.  Moreover, although GE del Caribe has focused on
arguing that the Agreement was not a binding contract, it has also
hinted that the Agreement might have been binding after all, but
only as part of a multilateral barter trade agreement, rather than
as a simple contract of sale.  Admittedly, GE del Caribe's
proposed interpretation of the Agreement is plausible, but it is
not our province to make findings of fact.  More importantly, even
if the Agreement had been a barter trade contract, GE del Caribe
failed to show that it would not have required GE del Caribe to
produce the letter of credit.  Given that SECOMAN's cause of action
arises out of GE's willful failure to produce a negotiable letter
of credit, it is unclear whether GE's proposed reading of the
Agreement would lead to a different result in this case.
   Finally, we address GE del Caribe's argument that the
Agreement was invalid because its purpose was unlawful.  Article
1403 of the Civil Code provides that the "obligation that is the
object of the contract must be legitimate."  We agree that under
Peruvian law, a contract for an unlawful purpose is void.  However,
as GE del Caribe admits, nothing on the face of the Agreement
indicates that the Agreement had an illegal purpose.  Instead, GE
del Caribe's argument is based on the plaintiff's testimony
indicating that SECOMAN requested payment in the form of a letter
of credit so that it could circumvent Peru's foreign exchange and
tax laws.  GE del Caribe specifically claims that SECOMAN violated
a Peruvian law that requires exporters to deposit any proceeds from
their sales abroad in the government-owned Central Bank, which
converts the proceeds to Peruvian currency at a rate that is
usually less favorable than the market exchange rate.
   Although the evidence did show that the purpose of
arranging for payment by means of a letter of credit was to permit
SECOMAN to choose an advantageous time to convert the letter into
currency, GE del Caribe has failed to establish that such a
strategy is, in fact, illegal under Peruvian law.  For example, it
is not clear that the duty to deposit the proceeds from export
transactions extends to forms of payment other than payment in
currency, such as payment by letter of credit.  Moreover, SECOMAN
presented evidence that even when payment is made in currency, the
duty to deposit the proceeds does not arise until the transaction
is consummated.  Because SECOMAN had not shipped any cotton when GE
del Caribe breached the Agreement, it does not appear that SECOMAN
was yet under a duty to deposit the $100,000 in the Central Bank.
   B.  Damages
   Reviewing the district court's findings as to damages for
clear error, we find only one.  The district court's award of
damages to SECOMAN apparently failed to take into account the
$100,000 that was paid up front to Mr. Gordillo as a deposit on the
Agreement.  The district court did not make an explicit finding
that the deposit was not to be considered an advance on the payment
due under the Agreement, and we would consider any such finding to
be clearly erroneous.  We will therefore reduce the award of
damages contained in the district court's judgment by $100,000.
   We reject, however, GE's contention that the award of
damages should be reduced by the amount of taxes that SECOMAN would
have had to pay on the proceeds from this sale.  Such a reduction
might have been in order only upon proof that SECOMAN would not be
liable for payment of taxes on its award, see Atlas Truck Leasing,
Inc. v. First N.H. Banks, Inc., 808 F.2d 902, 905 (1st Cir. 1987),
and no such proof was provided.
   We also do not agree with GE del Caribe's argument that
the district court erred both in determining that GE del Caribe
acted with dolus and in its calculation of damages.  A party acts
with dolus when that party willfully fails to perform an
obligation.  See C. Civ. art. 1318.  A determination that a
breaching party acted with dolus has a substantial effect upon the
damages available to the injured party.  Any person breaching a
contract is "responsible for compensating the losses and damages
[proximately] caused by its failure to perform."  See C. Civ. art.
1321.  However, a person who breaches a contract with dolus is also
liable for any unforeseeable damages caused by the breach.  See id.  
GE del Caribe correctly states that a finding of dolus requires a
finding that the breaching party intentionally breached an
obligation that it knew was binding, and that a court must analyze
the subjective intent of the breaching party in order to make a
finding of dolus.    
   In its opinion, however, the district court found that GE
del Caribe "knew that by failing to tender a negotiable letter of
credit, it was performing an act contrary to the contractual
obligations it had assumed" under the Agreement.  The court's
conclusion was based on evidence indicating that SECOMAN had
informed GE del Caribe of its pressing need for the negotiable
letter of credit, that at least some GE del Caribe employees were
aware that the Agreement required payment to be made by means of an
irrevocable letter of credit, and that GE del Caribe was concerned
about the significant decline in the price of cotton.  The court
also found the letter sent by GE del Caribe on June 11, 1990, in
which GE del Caribe claimed that SECOMAN's rejection of the terms
of the letter of credit "release[d] and excuse[d] [it] from any and
all performance [under the Agreement],"  to be evidence probative
of bad faith.  In particular, the letter indicates that GE del
Caribe felt the need to find a way to be released from the
Agreement, which in turn supports the implication that it knew
itself to be bound by the Agreement.  Reviewing these findings only
for clear error, with due deference to the trier of fact's greater
ability to gauge the demeanor and credibility of the witnesses, we
cannot say that the district court's findings were clearly
erroneous.
   GE del Caribe also raised several other challenges to the
district court's calculation of damages, including claims that the
court should have reduced the award of damages by the amount by
which the Peruvian foreign exchange restrictions would have reduced
SECOMAN's profits, that the court should not have based its award
of damages on the assumption that SECOMAN had actually purchased
1000 tons of cotton, that there was no evidence from which the
court could conclude that SECOMAN suffered losses on "cover sales,"
that the court failed to deduct $200,000 attributable to Mr. Manuel
Bentin's partial ownership of the cotton, and that the court should
not have compensated SECOMAN for the liability it incurred when it
breached two subsequent contracts for the sale of cotton.  We
affirm the district court on these points, substantially for the
reasons expressed in its opinion.
   C.  Attorney's Fees
   GE del Caribe contends that the district court's award
under P.R. R. Civ. P. 44.1(d) was erroneous because Puerto Rico law
was inapplicable to this case.  In the alternative, GE del Caribe
claims that, even if Rule 44 were applicable to this case, the
district court abused its discretion in finding that GE del Caribe
had litigated in an obstinate manner.  We disagree with both
claims.
   In general terms, a federal court sitting in diversity
applies the substantive law of the forum state and federal
procedural rules.  See 28 U.S.C.  2072 (the "Rules Enabling Act");
Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938); Woods-Leber v.
Hyatt Hotels of P.R., Inc., 124 F.3d 47, 50 (1st Cir. 1997).  A
state law "that would be controlling in an action upon the same
claim by the same parties in a State court" is substantive for Eriepurposes if it would "significantly affect the result of a
litigation for a federal court to disregard it."  Guaranty Trust
Co. v. York, 326 U.S. 99, 109 (1945).  It has long been the law in
this circuit that P.R. R. Civ. P. 44.1 is substantive for Eriepurposes.  See Dopp v. Pritzker, 38 F.3d 1239, 1252 (1st Cir.
1994); Pan Am. World Airways, Inc. v. Ramos, 357 F.2d 341, 342 (1st
Cir. 1966).  State conflict of laws rules are also considered
substantive for purposes of the Erie doctrine.  See David &
Zimmermann, Inc. v. Challoner, 423 U.S. 3, 4 (1975); Klaxon v.
Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941); New Ponce
Shopping Ctr. v. Integrand Assurance Co., 86 F.3d 265, 267 (1st
Cir. 1996).  The courts of the Commonwealth of Puerto Rico have
consistently followed the choice of law rules laid out in the
Restatement (Second) of Conflict of Laws.  See, e.g., Efectos
Litogrficos, C.A. v. National Paper & Type Co. of P.R., 112 P.R.
Dec. 389, 396-97 (1982); Partido Popular Democrtico v. Barreto-
Prez, 111 P.R. Dec. 199, 256 (1981); Archilla v. Smyth Worldwide
Movers, Inc., 106 P.R. Dec. 538, 550 (1977); Green Giant Co. v.
Tribunal Superior, 104 P.R. Dec. 489, 499 (1975); Fernndez vda. de
Fornaris v. American Surety Co. of N.Y., 93 P.R. Dec. 29, 48
(1966).  Pursuant to section 122 of the Restatement, "[a] court
usually applies its own local law rules prescribing how litigation
shall be conducted even when it applies the local law rules of
another state to resolve other issues in the case."  Restatement
(Second) of Conflict of Laws  122 (1969).
   GE's contention is that Rule 44.1 is applicable only in
those diversity cases in which the merits of the controversy are
determined on the basis of the substantive law of Puerto Rico.  GE
del Caribe concludes that, since Puerto Rico's conflict of laws
rules establish that Peruvian law governs the underlying dispute,
Rule 44.1 is inapplicable to this case.
   GE's argument is based upon the erroneous premise that if
a particular state law is "substantive" for purposes of Erieanalysis, it must also be substantive for purposes of conflict of
laws analysis.  To the contrary, the U.S. Supreme Court has
"reject[ed] the notion that there is an equivalence between what is
substantive under Erie doctrine and what is substantive for
purposes of conflict of laws."  Sun Oil Co. v. Wortman, 486 U.S.
717, 722 (1988) (citing Guaranty Trust Co., 326 U.S. at 108).  As
the Court explained in Sun Oil,  
        Except at the extremes, the terms
        "substance" and "procedure" describe very
        little except a dichotomy, and what they
        mean in a particular context is largely
        determined by the purposes for which the
        dichotomy is drawn.  In the context of our
        Erie jurisprudence, . . . that purpose is
        to establish (within the limits of
        applicable federal law, including the
        prescribed Rules of Federal Procedure)
        substantial uniformity of predictable
        outcomes between cases tried in a federal
        court and cases tried in the courts of the
        State in which the federal court sits.   

486 U.S. at 726-27.  In the conflict of laws context, in contrast,
the traditional substance-procedure dichotomy sought to reflect the
relative interests of both the forum and of the foreign
jurisdiction in having their law be applied to a case involving
both forum and foreign law.  See Restatement (Second) of Conflict
of Laws  122 cmts. a, b (1969); see generally James W. Moore,
Moore's Federal Practice  0.310[1] at 3129-30 (1996).  In fact,
the Restatement notes that characterizations of laws as
"substantive" or "procedural,"  
        [W]hile harmless in themselves, have led
        some courts into unthinking adherence to
        precedents that have classified a given
        issue as 'procedural' or 'substantive,'
        regardless of what purposes were involved
        in the earlier classifications. . . .  To
        avoid encouraging errors of that sort, the
        rules stated in [the Restatement] do not
        attempt to classify issues as 'procedural'
        or 'substantive.'  Instead they face
        directly the question whether the forum's
        rule should be applied.

Restatement (Second) of Conflict of Laws  122 cmt. b (1969).
   In cases involving the law of a state or country other
than the forum state, therefore, a district court sitting in
diversity must engage in a two-step inquiry.  First, the district
court determines whether a particular matter is procedural or
substantive for Erie purposes.  If the matter is procedural,
federal law is applied, and if substantive, the court follows the
law of the forum state.  Second, if a choice of law must be made,
for example, because a contractual choice-of-law clause is at issue
or because a tort was committed in another jurisdiction, the
district court applies the law that would be applied under the
conflict of laws rules of the forum state.  However, "[i]n
determining whether any state law will be adopted, the fact that a
matter is characterized as substantive by the state courts for
choice of law purposes does not connote that it will also be
substantive for purposes of Erie, and the converse should be true."  
Maryland Cas. Co. v. Williams, 377 F.2d 389, 393 n.1 (5th Cir.
1967).  Contrary to GE's contention, therefore, the fact that Rule
44.1 is considered "substantive" for Erie purposes does not bar a
finding that it is "procedural" for conflict of laws purposes.
   Turning to the case at hand, we are faced with the
question whether, pursuant to section 122 of the Restatement, the
courts of the Commonwealth of Puerto Rico would apply Rule 44.1 in
a suit otherwise subject to the laws of another state or country.  
Although we have found no Puerto Rico decision directly on point,
we are confident that the Supreme Court of Puerto Rico would
conclude that Rule 44.1 is a "local law rule[] prescribing how
litigation shall be conducted."  Restatement (Second) of Conflict
of Laws  122.  Rule 44.1 does not modify the parties' substantive
rights under the law.  Instead, it serves the institutional
concerns of the courts by allowing the imposition of sanctions upon
parties who abuse the judicial process.  After all, "[t]he purpose
behind [Rules 44.1 and 44.3] is to penalize 'a losing party that
because of his stubbornness, obstinacy, rashness, and insistent
frivolous attitude has forced the other party to needlessly assume
the pains, costs, efforts, and inconveniences of a litigation.'"  
Dopp, 38 F.3d at 1253 (quoting Fernndez v. San Juan Cement Co.,
118 P.R. Dec. 713, 718 (1987)).
   Our conclusion is reinforced by an evaluation of the four
factors listed by the Restatement to be taken into consideration in
making this determination: (1) "whether the issue is one to which
the parties are likely to have given thought in the course of
entering into the transaction"; (2) "whether the issue is one whose
resolution would be likely to affect the ultimate result in this
case"; (3) "whether the precedents have tended consistently to
classify the issue as 'procedural' or 'substantive' for choice-of-
law purposes"; and (4) "whether an effort to apply the rules of the
judicial administration of another state would impose an undue
burden upon the forum."  See Restatement (Second) of Conflict of
Laws  122 cmt. a.   
   First, there is no evidence whatsoever that the parties
intended to exclude the applicability of Rule 44.1, or to make
applicable to this case the litigation rules of another forum.  
Second, we do not agree that "the issue is one whose resolution is
likely to affect the ultimate result of the case," Restatement
(Second) of Conflict of Laws  122 cmt. a, because, although the
imposition of sanctions under Rule 44.1 does entail the payment of
a monetary penalty, the penalty is not a remedy arising out of the
cause of action.  Third, laws providing for awards of attorneys'
fees have not been consistently classified as either "procedural"
or "substantive" for choice-of-law purposes, either in Puerto Rico
or elsewhere.  Compare Du-Wel Prods. v. United States Fire Ins.,
565 A.2d 1113, 1120 (N.J. Super. 1990) (Michigan counsel fee law
held procedural and therefore inapplicable to suit brought in New
Jersey state court), with Aries v. Palmer Johnson, Inc., 735 P.2d
1373, 1380 (Ariz. App. 1987) (Arizona law providing for award of
attorney's fees was substantive); cf. Arno v. Club Med Boutique,
Inc., 134 F.3d 1424, 1425-26 (9th Cir. 1998) (leaning toward
treating fees issue as procedural, but noting that some courts have
held the contrary).
   Fourth, "an effort to apply the rules of the judicial
administration of" Peru "would impose an undue burden upon the"
courts in Puerto Rico.  Restatement (Second) of Conflict of Laws
122 cmt. a.  For example, this court has not been able to
determine what the Peruvian law of civil procedure would provide in
a situation such as the one at hand.  In any case, Peruvian civil
procedure is not as easily transplanted as its substantive law of
obligations and contracts.
    Finding that the district court did not err as a matter
of law in determining that GE del Caribe's conduct in this case
should evaluated under Rule 44.1, we turn next to the question
whether the district court abused its discretion in determining
that GE del Caribe behaved in a manner deserving of sanctions under
that rule.  See Dopp, 38 F.3d at 1253 (explaining that appellate
review of orders imposing sanctions under Rule 44.1 is for abuse of
discretion).  Rule 44.1(d) provides, in pertinent part: "In the
event any party or its lawyer has acted obstinately or frivolously,
the court shall, in its judgment, impose on such person the payment
of a sum for attorney's fees which the court decides corresponds to
such conduct."  "The purpose behind [Rule 44.1] is to penalize 'a
losing party that because of his stubbornness, obstinacy, rashness,
and insistent frivolous attitude has forced the other party to
needlessly assume the pains, costs, efforts, and inconveniences of
a litigation.'"  Dopp, 38 F.3d at 1253 (quoting Fernndez v. San
Juan Cement Co., 118 P.R. Dec. 713, 718 (1987)).  For the reasons
already discussed above, we have affirmed the district court's
determination that GE del Caribe breached its obligations under the
Agreement in bad faith.  A finding of bad faith implies that GE del
Caribe was aware that it was breaching its obligations under the
Agreement when, in June 1990, it attempted unilaterally to
terminate the Agreement.  We thus find no abuse of discretion in
the district court's further conclusion that GE del Caribe's
complete denial of liability, by forcing the plaintiffs and the
court to undergo the expense of litigating a full trial, was an
obstinate posture deserving of sanctions under Rule 44.1.
IV.  Conclusion
    For the foregoing reasons, we affirm the district court's
judgment on the issue of liability, but reduce the award of damages
by $100,000.  Furthermore, we affirm the district court's
imposition of sanctions under P.R. R. Civ. P. 44.1.  Costs are
awarded to appellees.

</body>

</html>